**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

DECKER MANUFACTURING )
CORPORATION, a Michigan corporation, )
  )
  ) Case No. 1:13-cv-00820-RHB
Plaintiff/Counterclaim Defendant, ) Hon. Judge Robert Holmes Bell
vs. ) Magistrate: Phillip J. Green
  )
THE TRAVELERS INDEMNITY ) **ORAL ARGUMENT REQUESTED**
COMPANY. )
  )
  )
Defendant/Counterclaim Plaintiff. )
_____

**<u>BRIEF IN SUPPORT OF THE TRAVELERS INDEMNITY COMPANY'S MOTION FOR
SUMMARY JUDGMENT BASED ON THE POLLUTION EXCLUSION</u>**

## TABLE OF CONTENTS

INDEX TO AUTHORITIES ................................................................................................ ii

CONCISE STATEMENT OF ISSUE PRESENTED .................................................................. v

CONTROLLING OR MOST APPROPRIATE AUTHORITY FOR THE RELIEF SOUGHT .... vi

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................................... 2

    I.   Nature of this Action. ........................................................................................ 2

    II.  The Albion-Sheridan Township Landfill. ............................................................ 2

        A.  Site History. ............................................................................................. 2

        B.  Site Description. ....................................................................................... 3

        C.  Operation of the ASTL. ............................................................................ 4

        D.  Waste Disposal at the Landfill. .................................................................. 7

        E.  The ASTL Structure. ................................................................................ 8

        F.  The State of Knowledge in the 1960s and 1970s. ........................................ 9

    III. The Travelers Policies. ................................................................................... 10

ARGUMENT ................................................................................................................ 11

    I.   Coverage is Precluded by Virtue of Decker's Intentional Discharge of Materials into the ASTL Based on the Plain Meaning of the Pollution Exclusion. ........................... 13

        A.  Michigan Law on Insurance Contract Enforcement and Interpretation. ........................ 13

        B.  The Michigan Supreme Court Would Likely Hold that the Expected-or-Intended Inquiry Focuses on the Initial Discharge *into* the Landfill. ............................................. 13

            1.  The Michigan Supreme Court has adopted the initial discharge rule, which is consistent with the plain-meaning approach to insurance contract interpretation. ........................................................................... 15

            2.  *Kent County's* "equivalent of a container" exception to the initial discharge rule is unsupported by the contract language and likely would not be adopted by the Michigan Supreme Court. ........................................................... 16

            3.  The majority, plain-meaning approach rejects a "container" exception. ..................... 21

    II.  The Relevant Discharge in this Case is the Discharge of Waste *into* the Landfill Because the ASTL Undisputedly was not a State of the Art Contained Area or Structure. ................................................................................................... 22

CONCLUSION ............................................................................................................. 25

# INDEX TO AUTHORITIES

## CASES

*Aero-Motive Co. v Great American Ins.,*
302 F.Supp.2d 738, 741-742 (W.D. Mich., 2003 (J. Quist)) .................................................... 23

*Anaconda Minerals Co. v. Stoller Chem. Co.,*
773 F. Supp. 1498, 1506 (D. Utah 1991) ................................................................. 22

*Arco Industries Corp. v. American Motorists Ins. Co.,*
448 Mich. 395, 402, 531 N.W.2d 168 (1995) ................................................................. 13

*Auto Owners Ins. Co. v. City of Clare,*
446 Mich. 1, 15, n 12; 521 N.W.2d 480 (1994) ................................................................. 15, 18

*Auto-Owners Ins. Co. v. Churchman,*
440 Mich. 560, 566, 489 N.W. 2d 431 (1992) ................................................................. 13

*Berrington v. Wal–Mart Stores, Inc.,*
696 F.3d 604, 608 (6th Cir. 2012) ................................................................. 14

*Broderick Investment Co. v. The Hartford Accident and Indem. Co.,*
954 F.2d 601, 607 (10th Cir. 1992) ................................................................. 18, 21

*Brumley v. Albert E. Brumley & Sons, Inc.,*
727 F.3d 574 (6th. Cir. 2013) ................................................................. 5

*City of Albion v. Guaranty Nat. Ins. Co.,*
73 F. Supp. 2d 846 (W.D. Mich. 1999) ................................................................. passim

*Clay v. Johns-Manville Sales Corp.,*
722 F.2d 1289 (6th Cir. 1983) ................................................................. 4

*Damar, Inc. v. U.S. Fire Ins. Co.,*
856 F. Supp. 679, 682 (N.D. Ga. 1993), *aff'd* 21 F.3d 1126 (11th Cir. 1994) ......................... 22

*Eghotz v. Creech,*
365 Mich. 527, 530, 113 N.W. 2d 815 (1962) ................................................................. 13

*Emerson Enters., LLC v. Kenneth Crosby New York, LLC,*
768 F. Supp. 2d 484, 491-92 (W.D.N.Y. 2011) ................................................................. 22

*Fruit of the Loom, Inc. v. Travelers Indem. Co.,*
284 Ill. App. 3d 485, 498 (1st Dist. 1996) ................................................................. 22

*Group Ins. Co. v. Czopek,*
440 Mich. 590, 597, 489 N.W. 2d 444 (1992) ................................................................. 13

*Harris Corp. v. Travelers Indem. Co.,*
1998 W.L. 1657171 (M.D. Fla. 1998) ................................................................. 18, 19

*Indiana Gas Co., Inc. v. Aetna Cas. and Surety Co.,*
951 F. Supp. 797, 805 (N.D. Ind. 1996), *vacated on other grounds*, 141 F.3d 314 (7th Cir. 1998) ................................................................. 18

*Kent County v. Home Ins. Co.*,
217 Mich. App. 250; 551 N.W.2d 424 (1996), *rev'd on other grounds*, 568 N.W.2d 671  passim

*Klapp v. United Ins. Group Agency, Inc.*,
468 Mich. 459, 473, 663 N.W. 2d 447 (2003)................................................................. 13

*Mays v. Transamerica Ins. Co.*,
103 Or.App. 578, 585; 799 P.2d 653 (Or.App. 1990)............................................. 22

*Millipore Corp. v. Travelers Indem. Co.*,
115 F.3d 21, 33 (1st Cir. 1997) ...................................................................... 18

*Oklahoma Publishing Co. v. Kansas City Fire and Marine Ins.*,
805 F. Supp. 905, 910 (W.D. Okla, 1992) ......................................................... 22

*Patz v St. Paul Fire and Marine Ins. Co.*,
15 F.3d 699 (7th Cir. 1994).................................................................. 18, 21

*Protective Nat. Ins. Co. of Omaha v. City of Woodhaven*,
438 Mich. 154; 476 N.W.2d 374 (1991) .......................................................... passim

*Providence Journal Co. v. Travelers Indem. Co.*,
938 F.Supp. 1066 (D.R.I. 1996) ..................................................................... 25

*Rasheed v. Chrysler Corp.*,
445 Mich. 109, 127 n. 28, 517 N.W. 2d 19 (1994) ....................................... 13

*Raska v. Farm Bureau Ins. Co.*,
412 Mich. 355, 361-362, 314 N.W. 2d 440 (1982)....................................... 13

*Robinson v Detroit*,
462 Mich. 439, 446; 613 N.W.2d 307 (2000) .............................................. 17

*Rory v. Continental Ins. Co.*,
473 Mich. 457; 703 N.W.2d 23 (2005) ....................................................... vi, 13, 19

*South Macomb Disposal Auth. v. American Ins. Co.*,
225 Mich. App. 635; 572 N.W.2d 686 (1997) ......................................... 14, 17

*St. Paul Fire and Marine Ins. Co. v. Warwick Dyeing Corp.*,
26 F.3d 1195, 1202 (1st Cir. 1994) .......................................................... 18, 21

*Town of Union v. Travelers Indem.  Co.*,
906 F. Supp. 782, (N.D.N.Y. 1995) .......................................................... 22

*Travelers Ins. Co. v. Waltham Indus. Labs. Corp.*,
883 F.2d 1092, 1097-99 (1st Cir. 1989)................................................... 22

*Traverse City Light & Power Board v. Home Ins. Co.*,
209 Mich. App. 112; 530 N.W.2d 150 (1995) .......................................... passim

*Wilkie v. Auto Owners Ins. Co.*,
469 Mich. 41, 51-52; 664 N.W.2d 776 (2003)........................................... 19

*Yoost v. Caspari*,
295 Mich.App. 209, 229, 813 N.W.2d 783, 795 (2012) ............................ 17

iii

*Zahn v. Kroger Co. of Michigan*,
    483 Mich. 34, 41; 764 N.W.2d 207 (2009) .......................................................................... 19

**RULES**

F.R.E. 703 ................................................................................................................................ 4

F.R.E. 804(a)(4) ....................................................................................................................... 4

F.R.E. 804(b)(1) ....................................................................................................................... 4

F.R.E. 807 ................................................................................................................................ 4

## <u>CONCISE STATEMENT OF ISSUE PRESENTED</u>

Did the property damage at the Albion-Sheridan Township Landfill Superfund Site arise out of any discharge of waste that was either expected or intended from the standpoint of Decker or of a person or organization for whose acts Decker is liable, such that the pollution exclusion in the Travelers Policies precludes coverage for the Underlying Claim?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY FOR THE RELIEF SOUGHT

Considerable authority from the Michigan Supreme Court sets forth the principles that control the question presented in this motion, including *Rory v. Continental Ins. Co.*, 473 Mich. 457; 703 N.W.2d 23 (2005) (insurance contracts are to be interpreted in accordance with their plain meaning), and *Protective Nat. Ins. Co. of Omaha v. City of Woodhaven*, 438 Mich. 154; 476 N.W.2d 374 (1991) (in interpreting pollution exclusion, Michigan Supreme Court holds that focus is on initial discharge into the environment, not subsequent migration).  Michigan's intermediate appellate court has also rendered several decisions that bear on the analysis, including most notably *Traverse City Light & Power Board v. Home Ins. Co.*, 209 Mich. App. 112; 530 N.W.2d 150 (1995) (applying *City of Woodhaven* holding to discharge of contaminant in a quarry), and *Kent County v. Home Ins. Co.*, 217 Mich. App. 250; 551 N.W.2d 424 (1996), *rev'd on other grounds*, 568 N.W.2d 671 (altering *City of Woodhaven* rule where initial discharge is contaminants into engineered landfill thought to be equivalent of container).  *Kent County* is not controlling, and indeed Travelers argues that the Michigan Supreme Court would not follow that decision.

Finally, a decision by Judge Quist of this Court is relevant in that it sets forth one approach for construing a slightly different but similar pollution exclusion based on the discharge of contaminants into the landfill in question:  *City of Albion v. Guaranty Nat. Ins. Co.*, 73 F. Supp. 2d 846 (W.D. Mich. 1999).

Defendant/Counterclaim Plaintiff The Travelers Indemnity Company ("Travelers"), in support of its motion for summary judgment based on the pollution exclusion contained in the Travelers Policies (as defined below) states as follows:

## PRELIMINARY STATEMENT

Each of the insurance policies issued by Travelers to Decker Manufacturing Corporation ("Decker") contains a pollution exclusion that precludes insurance coverage for property damage arising out of any discharge of waste that "is either expected or intended from the standpoint of any insured or any person or organization for whose acts or omissions any insured is liable." It is undisputed that the discharges of Decker's waste at the Albion-Sheridan Township Landfill ("ASTL") -- and in fact the discharges of all of the waste there -- occurred when that waste was intentionally dumped into the unlined landfill. Accordingly, the pollution exclusion precludes insurance coverage for the Underlying Claim (as defined below), and Travelers seeks summary judgment to that effect.

Travelers expects Decker to urge the Court to focus not on the initial, intentional discharge of the waste into the landfill, but rather on the subsequent migration of the waste from the landfill into the surrounding soil and groundwater, (thus likening the landfill itself to a container) for purposes of the pollution exclusion. Decker's position is wrong, both on the law and the facts.

Michigan law requires the clear and unambiguous language of the pollution exclusion to be applied as written, and by its plain terms, property damage arising from any intentional discharge of waste into an unlined landfill such as the ASTL is not covered. Moreover, even if Decker's focus on the ultimate migration of the pollution would be appropriate in some context, it is certainly not appropriate in a case such as this where the undisputed material facts show that the ASTL could hardly be considered a "container." It is more appropriately characterized as a sieve. The material facts show that the ASTL was a poorly managed and un-engineered open pit,

dug out of the bare earth, with no liner separating the waste from the soil and groundwater; it was anything but state of the art. Indeed, it is undisputed that the wastes sent to the ASTL were discharged directly into the soil and the exposed groundwater table.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I. Nature of this Action.

Decker alleges that it is entitled to insurance coverage under the Travelers Policies (defined below) for defense and indemnity costs incurred with respect to the ASTL Superfund Site. Decker specifically seeks insurance coverage for defense and indemnity costs it incurred with respect to: (1) a claim brought by the United States Environmental Protection Agency ("US EPA") in 1995 ("US EPA Claim); (2) an underlying lawsuit captioned: *United States of America v. City of Albion, Michigan v. Cooper Industries, Inc., et. al. v. Decker Manufacturing Corporation,* Case No. 1:97-cv-1037, filed in the United States District Court for the Western District of Michigan ("EPA Lawsuit"); and, (3) a claim by the State of Michigan requesting payment of Michigan Department of Environmental Quality ("MDEQ") past response costs for actions taken at the ASTL Superfund Site ("MDEQ Claim") (collectively the "Underlying Claim").

### II. The Albion-Sheridan Township Landfill.

#### A. Site History.

The ASTL is an inactive landfill located at 29975 East Erie Road, approximately one mile east of Albion, in Sheridan Township, Calhoun County Michigan. (Ex. A, Administrative Order for Remedial Design and Remedial Action, ¶ 6 a.).[1]

---

[1] Attached as Exhibit 1 is the Affidavit of Nicole E. Wilinski in support of The Travelers Indemnity Company's Brief in Support of Motion for Summary Judgment Based on the Pollution Exclusion. Exhibits A-CC referenced in this brief are attached to Exhibit 1.

Prior to 1966, the landfill site was used as a sand and gravel borrow pit and also for open, non-permitted and uncontrolled dumping.  (Ex. A, ¶ 6.b; Ex. B, US EPA Third Five Year  Report, Section 3.3, p. 3; Ex. C, ASTDR Public Health Assessment, p.1; Ex. D, Public Health Assessment, p.2).

From 1966 to 1981 the ASTL was privately owned and operated by Gordon Stevick.  (Ex. D, p. 2; Ex. E, Final Remediation Investigation Report, p. 1-4).   During this time, the ASTL accepted municipal and industrial wastes.  (Ex. A, ¶ 6.b; Ex. C, pp. 1-2; Ex. D, p. 2; Ex. E, p. 1-4).   Liquid industrial wastes, including sludges and waste oil were also dumped in the ASTL.  (Ex. A, ¶ 6.b.).  In the early 1970s, approximately 6000 cubic yards of metal plating sludges were disposed of at the ASTL.  (Ex. A, ¶ 6.b; Ex. C, pp. 1-2; Ex. D, p.2).   Other materials such as paint wastes and thinners, oil and grease, and dust, sand and dirt containing fly ash and casting sand were also disposed of at the ASTL.  (Ex. A, ¶ 6.b; Ex. C, pp. 1-2; Ex. D, p. 2;).  The ASTL was closed in 1981.  (Ex. A, ¶ 6.c; Ex. C, p.1; Ex. D, p.2).

### B.      Site Description.

The ASTL is approximately 18 acres in size and is located on a 30 acre piece of land 400 feet north of the North Branch of the Kalamazoo River.  (Ex. D, p. 2; Ex. A, ¶ 6.a).  Soils beneath the ASTL are permeable and the ground water is shallow.   (Ex. F, Sullivan Expert Report, Opinion 2, p. 16; Ex. G, NPL Site Narrative; Ex. H, Graham Expert Report).  The predominant soil type in the unsaturated soils beneath the waste in the ASTL is sand.  (Ex. H; Ex. I, Deposition of Hartman p. 30[2]; Ex. J, Deposition of Havens, pp. 57-58).  There is no artificial or natural liner beneath the ASTL. (Ex. G; Ex. B, p. 4; Ex. H, Section C.2.).  The bottom of the waste pile in the

_____

[2] Terrance Hartman was an environmental sanitarian with the MDNR from November of 1979 to 2001.  He was involved in the solid water program, the licensing of solid waste facilities and for review of approval of engineering plans for the development of new landfills.  (Ex. I, pp. 9-10).

ASTL is zero to ten feet from the water table, and at least some of the waste is in direct contract with the ground water.  (Ex. H, Section C.3.; Ex. F, Opinion 2, p. 16; Ex. K, Record of Decision, Section C.3., p. 4; Ex. L, topographical map).  There also was a large pond on the north end of the landfill site.  (Ex. J, p. 67; Ex. L).

### C.    Operation of the ASTL.

No engineering or operational plans exist for the ASTL.  (Ex. I, pp. 58-59; Ex. M, 7/16/1980 Evaluation Report).   A topographical map was prepared in March 1966 and submitted to the Calhoun County Health Department and Michigan Department of Health.  (Ex. L). The topographical map and an additional drawing submitted with it show the bottom of the excavated portion of the ASTL to be only two feet above the water table, at an elevation of 102+ with the water table at an elevation of 100.  (Ex. L; Ex. N, p. 6).

In reality, the ASTL was nothing more than a large hole or pit that had been dug into the ground and solid, semi-solid and liquid waste was routinely dumped directly into the unlined pit before being covered over with a layer of sand.  (Ex. F, Opinion 2, pp. 10-11, 16-17; Ex. J, pp. 57-60; Ex. O,  Deposition of Wilkinson, pp. 16-17).[3]  At times, waste was simply dumped on top

---

[3] Travelers expert, Daniel Sullivan, relied upon Wilkinson's testimony to form his opinion in this action, as permitted by F.R.E. 703.   More specifically, depositions and witness statements regarding historical waste disposal practices and operation of waste facilities, such as the Wilkinson testimony, are facts that hydrogeologists, like Sullivan, reasonably and regularly rely on in forming opinions in cases like this one.  Wilkinson's deposition testimony is also admissible under F.R.E. 804(b)(1) and/or F.R.E. 807.   Arlo Wilkinson is deceased and therefore is unavailable pursuant to F.R.E. 804(a)(4).   However, his testimony is admissible under F.R.E. 804(b)(1), which permits former testimony given by a witness at a lawful deposition to be offered against a party whose predecessor in interest had an opportunity and similar motive to develop the testimony by direct examination.   The term "predecessor in interest" does not require privity and is to be given a "realistically generous" interpretation.  *See Clay v. Johns-Manville Sales Corp.,* 722 F.2d 1289 (6th Cir. 1983).  Wilkinson's deposition is also admissible under F.R.E. 807.   The deposition was taken under oath and transcribed by a court reporter.   Mr. Wilkinson was employed by the ASTL owner as the primary operator and thus has the best knowledge of how the landfill was operated, a material issue in this action.   Wilkinson was not a responsible party in the enforcement action and had no motivation to do anything other than truthfully answer the

of the ground surface. (Ex. F, Opinion 2; Ex. O, p. 11.  Waste was also routinely dumped directly

into the exposed groundwater table.  (Ex. F, Opinion 2, pp. 10-11, 16-17).  Liquid industrial

wastes were also dumped directly into a pond on the north end of the site.  (Ex. O, p. 11-12).

Theodore Havens, who was employed by the Calhoun County Health Department from

1967 until his retirement in 2007 as a sanitarian and eventually as Director of Environmental

Health, testified as follows regarding the operation of the ASTL:

A:     It was kind of like dump over the bank kind of thing.  It was kind of like –
       there was some depressions out there that they sort of filled in and dumped
       it and then they filled over it with sand to cover it.  I think that's how I
       would say they filled it.

Q:     And when you say dump over the bank, was there a large excavated area
       at the landfill site?

A:     Let's see.  You know, they'd sort of back up to this bank and then sort of
       dump it over and you could have an exposed area of 50, 100 feet or
       something like that and it would just roll down the bank into the hole, into
       the depression, and then they would try to doze over, sand over the top of
       it and let it run down the face of the bank, the cover.

Q:     Was sand then used as the cover at the landfill site during that time frame?

A:     This site was mostly sand and gravel, as I recall.

Q:     And was the cover material the material that was excavated from the site?

A:     Yes, as I remember.

Q:     And was the cover material placed over the waste immediately after it was
       deposited?

A:     One of the issues at that site was daily cover, so I'd have to say no. . .

(Ex. J, pp. 57-60).

Arlo Wilkinson, who worked for the owner, Gordon Stevick at the ASTL, testified

_____

questions posed by the US EPA.  *See Brumley v. Albert E. Brumley & Sons, Inc.,* 727 F.3d 574
(6th. Cir. 2013) (transcript of recorded conversation between father and son held admissible under
F.R.E. 807).

regarding the operation of the ASTL during his deposition taken in 1990 by the US EPA. Wilkinson testified that he "would take the dozer and dig a trench, and we would fill that trench up, and I would cover it up at night.  Then, after we got over the hill, why, they just dumped on top of ground.  They didn't dig much."  (Ex. O, pp. 10-11).  He testified that a pond was located on the north end of the landfill, and that they disposed of liquid waste directly into the pond.  (Ex. O, p. 11).  In fact, he dug the pond for that purpose.  (Ex.  O, p.12).  He also said that he dug close to "a hundred and fifty" holes, some of which were 25 and 30 feet deep, which were filled with garbage at the direction of Gordon Stevick.  (Ex. O, p. 17).

The ASTL had a long history of non-compliant operation.  Mr. Havens testified about the landfill owner's attitude toward compliance as follows:

> He was belligerent.  He was noncompliant.  It seems to me like you'd write him up many times for the same kind of thing.  There was always a reason or excuse why he couldn't do something, you know, machinery broken down, couldn't get a part, you know, too wet, too cold, you know, the ground's frozen, too many rules, you know.  There was always something.

(Ex. J, pp. 48-49).  Mr. Havens described the general state or maintenance of the ASTL site from 1967-1981 as "fair to poor, marginal."  (Ex. J, p. 69).  He also testified "[o]h, I'll bet you that file that we have on that place is big" and "[i]t was always like the worst one."  (Ex. J, pp. 105, 179). Mr. Haven's further testified, "[i]t wasn't landfill, it was a dump."  (Ex. J, p. 35).

A January 12, 1973 letter sent to Stevick by Mr. Havens further documents the poor operation at the ASTL and the failure to comply with even the minimum requirements established for landfill operations.  (Ex. P).  The letter provides in part:

> … Since that time the Calhoun County Health Department has put forth considerable effort to encourage you to upgrade your landfill to meet minimum requirements set forth in the Rules of Act 69.  Our goal was to eliminate the health hazard caused by unattended dump.
>
> After nearly eight years we have progressed to a point where we can no longer

6

tolerate infractions against this Act.

(Ex. P).   Mr. Havens testified that the statement in the letter about "considerable effort" was a reference to a "lot of inspections, a lot of talking to with Mr. Stevick about, you know, complying with the rules and the act."  (Ex. J, p. 104).

Due to Stevick's operational violations, an informal hearing was held on March 28, 1973. (Exs. Q and R).   Stevick was again notified by a letter dated October 4, 1978 that the ASTL was "suffering from a number of operational problems."   (Ex. S).   These operational problems included: proper spreading and compaction or refuse; organization and monitoring of dumping; proper daily cover and leachate generation.  (Ex. S).

The ASTL was inspected regularly by Calhoun County and/or MDNR employees.  (Ex. I, pp. 26-28).  During these inspections an Evaluation Report was completed.  *Id.*  These Evaluation Reports demonstrate the operational problems that were ongoing at the ASTL.  (Attached as Ex. T is a sampling of the Evaluation Reports).

### D.   Waste Disposal at the Landfill.

The ASTL was used for waste disposal by residents and industries located in the City of Albion and surrounding area.   (Ex. U, Deposition of Bernard Konkle, pp. 65-66).[4]   Decker routinely disposed of waste materials at the ASTL during the entire period it was in operation. (Complaint, ¶ 25 [Doc. # 1-1]; Ex. U, p. 64; Ex. V, Deposition of Coleman, pp. 58-59).  Decker's manufacturing waste was collected at its facility in a large metal container referred to as a "gondola" that was stored inside the plant and, when full, was loaded  on to a truck and taken to

---

[4] Bernard Konkle is Chairman of the Board for Decker.  His father started the company in 1927. Mr. Konkle worked for Decker from 1949 until his retirement in 2011.  He served as President from 1992 to 2011.  (Ex. U, pp. 8 – 13).  Lonnie Coleman is currently the Vice President of Operations for Decker.  He has been employed by Decker since 1969 in various positions, including production and plant manager.  (Ex. V, pp. 7-10).

the ASTL.  (Ex. U, pp. 28-29 ).  Decker's waste  in the gondola had a mud-like consistency and was "pumpable" when taken to the landfill.  (Ex. U, pp. 28- 30, 67).

Decker employees hauled Decker's "mud-like" waste material "to the dumpsite" approximately once per week and dumped it directly into the unlined, earthen landfill pit.  (Ex. U, pp. 60, 66-69; Ex. V, pp. 59-61).  Mr. Wilkinson testified that Decker also occasionally brought liquid cleaning fluid to the ASTL in a barrel, and Decker would empty the contents of the barrel directly into the landfill.  (Ex. O, pp. 38-39).

     **E.**     **The ASTL Structure.**

Travelers retained an expert, Daniel Sullivan, to provide an opinion regarding whether the ASTL was state of the art and whether it was designed to contain the waste discharged to it.  Mr. Sullivan is a Vice President/Principal Hydrogeologist with Roux Associates, Inc.  He has a Bachelor of Science and Master of Science degree in geology and extensive landfill experience, including working as a hydrogeologist at the US EPA.  (Ex. F, Appendix A).  Decker retained two experts, Tim Douthit ("Douthit") and Andrew Graham ("Graham") to provide expert opinions about the ASTL in this matter.[5]

The Parties' experts agree that the ASTL was not was an engineered landfill structure or otherwise designed to contain waste materials.  (Ex. F; Ex. Y, Deposition of Sullivan, pp. 18, 22; Ex. Z; Douthit Rebuttal Report; Ex. AA, Deposition of Douthit, pp. 45-46).     Opinion 2 in

---

[5] Douthit is the Director of Technical Services for In Aqua Veritas, LLC, where he is primarily responsible for the management and implementation of environmental fate and transporting modeling, risk-based corrective action and natural attenuation services.  Douthit has a Bachelor of Science degree in geology and a Master of Science degree in geochemistry.  (Ex. W, Douthit Expert Report, Exhibit A).   Graham is the Environmental Department Manager at DeLisle Associates LTD.  Graham's employment involves conducting Phase I environmental property assessments, soil sampling, groundwater sampling, map making with a design CAD, and designing and installing treatment systems.  (Ex. X, Deposition of Graham p. 18).  He has a Bachelor of Science Degree in geology.  (Ex. H, Exhibit B).

Sullivan's Expert Report states as follows:

> The ASTL was not an engineered structure nor was it designed to prevent, and it did not prevent, the migration of buried waste constituents to soil or groundwater. The sandy bottom of the excavations used to bury wastes at the ASTL were incapable of containing or limiting the migration of liquid wastes or landfill leachate. <u>The migration of liquid waste and leachate from the burial trench to soil and groundwater was inevitable once disposal of wastes began.</u>

(Ex. F, Opinion 2, p. 16).  Douthit, Decker's expert, agrees with Opinion 2 in Sullivan's Expert Report.  (Ex. Z, ¶ 2 Douthit Rebuttal; Ex. AA, pp. 45-46).

Graham's opinions in his report are consistent with and support Sullivan's opinion that the ASTL was not designed to nor did it prevent the migration of waste to the soil or groundwater. Graham's report states in relevant part:

> …there are no obvious clay confining layers beneath the site that are extensive enough to effectively isolate the landfill.  The clay units that were encountered while drilling tend to be relatively thin and do not necessarily correlate to other borings.  <u>The silty sediments that are present tend to restrict ground water flow, but not enough to sufficiently contain leachate within the landfill.</u>
>
> *       *       *
>
> At areas where the bottom of the waste is within the groundwater, any leachate generated in the landfill is released into the groundwater instantaneously.  Where there is a ten-foot distance between the bottom of the landfill and the top of the groundwater table, it takes about 1/3 of a day or less for it to reach the groundwater table ….

(Ex. H, sections C, E.) (Emphasis added.)

In addition to the expert opinions, Mr. Havens testified that the bottom of the landfill excavation at two feet above the ground water was too close to the water table, because "[t]here would be absolutely no containment of any leachate running out of that area probably getting into the ground water." (Ex. J, p. 101).

**F.      The State of Knowledge in the 1960s and 1970s.**

Sullivan and Douthit both acknowledge that by 1966, when the ASTL began operating, it

was known and understood in the industrial, scientific, and engineering communities that soil or groundwater contamination would likely result from the disposal of waste into non-engineered landfills in unsuitable locations.  (Ex. F; Ex. Y, p. 31; Ex. AA, pp. 44-46).  Sullivan's further opinion that "[b]y 1966, construction of a state of the art landfill would have required the selection of a more suitable location [than that of the ASTL] further from surface water, with low permeability surficial soils, and a deeper ground water table" also is uncontested.  (Ex. F, Opinion 1; Ex. Y, pp. 30-31; Ex. AA, p.45 Douthit).

Sullivan testified "at this landfill, Albion, they did not follow that state of the knowledge practice," meaning "the knowledge that somebody in the engineering, environmental, or waste disposal industry would be familiar with."  (Ex. Y, pp. 23-24).  He further testified, "in the '60s and '70s landfill siting was a big issue, and arguably this was about as bad a landfill site, the Albion Township Landfill, that you could have had." (Ex. Y, pp. 27-28). This is unrebutted.

III.   **The Travelers Policies.**

Travelers issued the following primary general liability policies to Decker ("Travelers Policies"):

- Policy No. 650-2406865-IND/650-822A082-2-IND, effective from January 1, 1973 to January 1, 1975 ("1973-1975 Travelers Policy") (attached as Exhibit BB);[6]

- Policy No. 650-822A140-1-IND, effective from January 1, 1975 to January 1, 1976 ("1975-1976 Travelers Policy") (attached as Exhibit CC);

- Policy No. 650-822A140-1-IND, effective from January 1, 1976 to January 1, 1977 ("1976-1977 Travelers Policy") (attached as Exhibit DD).

The 1973-1975 Travelers Policy provides:

The Travelers agrees to pay on behalf of the Insured all sums which the Insured

_____

[6] The 1973-1975 Travelers Policy is a two year policy.  Effective January 1, 1974 to January 1, 1975 the policy number was amended to 650-822A082-2-IND.

shall become legally obligated to pay as damages because of… property damage to which this Section applies, caused by an occurrence…

The 1973-1975 Travelers Policy contains the following exclusion:

LIMITATION OF COVERAGE FOR POLLUTION – MICHIGAN

It is agreed that the insurance does not apply

(a)    to bodily injury or property damage arising out of any emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant

    (1)    if such emission, discharge, seepage, release or escape is either expected or intended from the standpoint of any insured or any person or organization for whose acts or omissions any insured is liable, or

    (2)    resulting from or contributed to by any condition in violation of or non-compliance with any federal rule, regulation or law applicable thereto:

    but this exclusion (a) does not apply to property damage arising out of any emission, discharge, seepage, release or escape of petroleum or petroleum derivatives into any body of water;

(b)    to property damage arising out of any emission, discharge, seepage, release or escape of petroleum or petroleum derivatives into any body of water, but this exclusion (b) does not apply to property damage resulting from fire or explosion arising out of any emission, discharge, seepage, release or escape which neither

    (1)    is expected or intended from the standpoint of any insured or any person or organization for whose acts or omissions any insured is liable, nor

    (2)    results from or is contributed to by any condition in violation of or non-compliance with any federal rule, regulation or law applicable thereto.

(See Exhibit BB). The 1975-1976 and 1976-1977 Travelers Policies included similar language.

(See Exhibits CC-DD).

## ARGUMENT

The main inquiry presented by this motion is whether the property damage at the ASTL arose from any discharge of waste that was expected or intended from the standpoint of Decker or any person or organization for whose acts or omissions Decker is liable.  That standard is easily

11

met under the undisputed facts.

Here, it is undisputed that Decker both expected and indeed intended to discharge its waste into the ASTL. Like all others that discharged their waste at the ASTL, Decker routinely hauled its waste to the landfill and dumped it directly into the unlined pit. That practice alone is sufficient to preclude coverage under the plain language of the pollution exclusion.

Travelers acknowledges that there is some Michigan intermediate authority for the proposition that this initial discharge is not necessarily the "relevant" discharge when applying a pollution exclusion in cases where the landfill was acting as a state of the art "container." These cases suggest that when the landfill was "state of the art," and was thus constructed specifically to contain the deposited waste, the "relevant" discharge is the subsequent escape of the waste from the landfill into the surrounding environment.

Travelers submits, however, that these decisions are inapposite to this matter, and, in any event, are inconsistent with the approach taken by the Michigan Supreme Court in *City of Woodhaven*, and are based on a different version of the pollution exclusion than that which is included in the Travelers Policies.

Moreover, even if the Court were inclined to follow these intermediate court decisions, coverage is ***still*** precluded here as the undisputed facts show that the ASTL was nowhere near state of the art, and clearly was not designed, constructed, or operated in a manner that would be conducive to containing the waste therein. The undisputed fact is that, the ASTL was nothing more than a large unlined hole in the bare ground; a classic "dump." Accordingly, even if the Court were to employ this analysis, Travelers would still be entitled to summary judgment as a matter of law.

I.   **Coverage is Precluded by Virtue of Decker's Intentional Discharge of Materials into the ASTL Based on the Plain Meaning of the Pollution Exclusion.**

A.   **Michigan Law on Insurance Contract Enforcement and Interpretation.**

The rules of insurance contract interpretation and construction are of particular importance to the issue at hand, and are well settled in Michigan.  An insurance policy is treated the same as any other contract; the court will determine the parties' agreement and effectuate the parties' intent.  *Auto-Owners Ins. Co. v. Churchman*, 440 Mich. 560, 566, 489 N.W. 2d 431 (1992) citing *Eghotz v. Creech*, 365 Mich. 527, 530, 113 N.W. 2d 815 (1962).  "Insurance policies *are* subject to the same contract construction principles that apply to any other species of contract."  *Rory v. Continental Ins. Co.,* 473 Mich. 457, 461, 703 N.W. 2d 23 (2005) (emphasis in original).  "The primary goal in the construction or interpretation of a contract is to honor the intent of the parities."  *Klapp v. United Ins. Group Agency, Inc.,* 468 Mich. 459, 473, 663 N.W. 2d 447 (2003) quoting *Rasheed v. Chrysler Corp.,* 445 Mich. 109, 127 n. 28, 517 N.W. 2d 19 (1994).  "[T]he language of the parties' contract is the best way to determine what the parties intended."  *Klapp* at 476.

Further, an insurance company may not be held responsible for a risk that it did not assume.  *Arco Industries Corp. v. American Motorists Ins. Co.,* 448 Mich. 395, 402, 531 N.W.2d 168 (1995); *Churchman* at 567; *Group Ins. Co. v. Czopek,* 440 Mich. 590, 597, 489 N.W. 2d 444 (1992).  Any clause in an insurance policy is valid as long as it is clear, unambiguous and not in contravention or public policy.  *Raska v. Farm Bureau Ins. Co.,* 412 Mich. 355, 361-362, 314 N.W.2d 440 (1982).

B.   **The Michigan Supreme Court Would Likely Hold that the Expected-or-Intended Inquiry Focuses on the Initial Discharge *into* the Landfill.**

It is undisputed that Decker expected, and indeed intended, to discharge its waste into the ASTL.  Decker employees hauled Decker's waste to the landfill approximately once per week and dumped it directly into the unlined pit and onto the ground.  (Ex. U, pp. 60, 66-69; Ex. V, pp. 59-

13

61). Consequently, if the pollution exclusion is given its plain meaning, it precludes coverage here, since the alleged property damage "ar[ose] out of any . . . discharge . . . of any liquid, solid, gaseous or thermal waste or pollutant [and the] discharge . . . [was] either expected or intended from the standpoint of any Insured." *See e.g., City of Woodhaven.*

Travelers anticipates that Decker will attempt to rely on a decision from Michigan's intermediate appellate court, *Kent County v. Home Ins. Co.*, 217 Mich. App. 250; 551 N.W.2d 424 (1996), *rev'd on other grounds*, 568 N.W.2d 671. According to *Kent County*, if waste materials are placed in a state of the art contained area or structure and later escape into the environment, the latter discharge is the "relevant discharge" for purposes of applying the pollution exclusion. *Id.* at 288. That approach was followed, without analysis, in another intermediate Michigan appellate court case, *South Macomb Disposal Auth. v. American Ins. Co.*, 225 Mich. App. 635; 572 N.W.2d 686 (1997), as well as in *City of Albion v. Guaranty Nat. Ins. Co.*, 73 F. Supp. 2d 846 (W.D. Mich. 1999) (J. Quist). Travelers respectfully submits that this analysis is flawed, would not be approved by the Michigan Supreme Court,[7] and, in any event, is irrelevant to this case as the ASTL cannot credibly be described as anything even remotely close to "state of the art" and therefore it cannot be considered a "container" as that concept was described by the *Kent County* court. Accordingly, and notwithstanding Judge Quist's deferral to that approach in *City of Albion,* Travelers urges the Court to hold first and foremost that coverage is precluded because the initial discharge of waste into the ASTL was expected or intended.[8]

---

[7] If the highest court has not yet addressed the precise issue at hand, a federal court "must predict how the court would rule by looking to all the available data." *Berrington v. Wal–Mart Stores, Inc.,* 696 F.3d 604, 608 (6th Cir. 2012) (citation and internal quotation marks omitted). Intermediate appellate court decisions can be helpful in that regard, but are not dispositive. *Id.*

[8] While Judge Quist endorsed the potential application of this state of the art container approach in the *City of Albion* case, based on the limited record before him, he could not determine whether

14

1.    **The Michigan Supreme Court has adopted the initial discharge rule, which is consistent with the plain-meaning approach to insurance contract interpretation.**

In *Auto Owners Ins. Co. v. City of Clare*, 446 Mich. 1, 15, n 12; 521 N.W.2d 480 (1994), the Michigan Supreme Court explicitly declined to reach the question of whether the discharge *from*, rather than *into*, a landfill is the proper focus for determining the insured's intent or expectation for purposes of enforcement of a pollution exclusion in the context of pollution at a landfill site.  Thus, the matter presents an open question for Michigan's highest court, although Travelers submits that if required to definitively address this issue the court would again focus, as it did in *City of Woodhaven, infra*, on the initial discharge.

In *City of Woodhaven,* the Michigan Supreme Court examined the question of the relevant discharge in connection with a similar, although somewhat different pollution exclusion.  *City of Woodhaven* involved the spraying of pesticides, resulting in bodily injury.  The insured argued that the discharge of the pesticide to an area where it could come into contact with the injured party's skin was both a sudden and an accidental event.  *Id.* at 377.  The Michigan Court of Appeals agreed.  But the Supreme Court reversed, finding that the Court of Appeals decision "misapplies and misconstrues the clear language" of the insurance contract:

> It is clear that the discharge, dispersal, release, or escape to which both the exclusion and the exception refer is the *initial* discharge, dispersal, release, or escape *into* the atmosphere and *not* the subsequent migration.

*Id.* at 377 (emphasis in original).

The Court thus recognized that the language of the pollution exclusion does not require that the bodily injury or property damage be expected or intended.  Nor does it matter that the

---

the ASTL, in fact was a state of the art container, and thereby denied summary judgment.  The parties here, however, have gone further and, as discussed herein, have developed a clear record showing as a matter of law that the ASTL does not qualify as a state of the art container.  As a result, this "subsequent discharge" approach does not apply here.

15

initial dispersal is undertaken in a legal or seemingly harmless fashion, only to be followed by a later migration that causes harm. The focus of the exclusion is properly on the initial discharge of the pollutant.

The language of the pollution exclusion in the Travelers Policies mandates the same result here. The pollution exclusion at issue here clearly precludes coverage for property damage "arising out of *any* emission, discharge, seepage, release or escape… if such emission, discharge, seepage, release or escape is either expected or intended…." (Emphasis added). The use of the word "any" makes it clear that even if the subsequent migration could be characterized as a second "discharge," the language nevertheless precludes coverage so long as the property damage "aris[es] out of" the first discharge. Because the property damage at issue in this case arose out of the discharges into the ASTL, coverage is precluded.

> **2.** ***Kent County's* "equivalent of a container" exception to the initial discharge rule is unsupported by the contract language and likely would not be adopted by the Michigan Supreme Court.**

In *Kent County*, which involved the dumping of solid waste into an engineered, state of the art landfill, the Michigan Court of Appeals acknowledged the initial-discharge rule as adopted by *City of Woodhaven*, but declined to apply it. The Court recognized that "when the offending material is sprayed into the atmosphere (*City of Woodhaven*) or placed in a quarry (*Traverse City*),[9] the discharge has occurred, and the expected course of the migration is irrelevant." *Kent County* at 269. The Court distinguished those cases from the context of the placement of a container into the ground. The court then extended the "container" exception, reasoning that when the initial discharge is a discharge of solid waste into a landfill that is "thought to be the

---

[9] *Traverse City Light & Power Board v. Home Ins. Co.*, 209 Mich. App. 112; 530 N.W.2d 150 (1995) involved the dumping of waste into a former quarry. The Michigan Court of Appeals in that case correctly followed the initial-discharge approach mandated by *City of Woodhaven,* holding that the relevant inquiry is whether the initial discharge into the quarry was intended.

16

equivalent of a container," the initial-discharge rule does not apply.  *Id.*  The court thus held that, if waste materials are placed in a contained area or structure and later escape into the surrounding environment, "the latter discharge is the relevant discharge."  *Id.* at 288.

Travelers submits that the *Kent County* court's approach of focusing on the latter discharge as the relevant discharge should not be followed in this case for several reasons.  First, there is a material difference between the contract language at issue in that case versus this one. The exclusion in *Kent County* (and in *South Macomb*) applied to property damage "arising out of *the* discharge, . . . ." *Kent County,* 217 Mich. App. 255 (emphasis added) (*South Macomb,* 225 Mich.App. at 269).  But the exclusion in the Travelers Policies applies to property damage "arising out of *any* emission, discharge, [etc.]." (emphasis added).  It is well settled under Michigan law that there is a material distinction between the articles "the" and "any."  *See, e.g., Robinson v Detroit,* 462 Mich. 439, 446; 613 N.W.2d 307 (2000) (highlighting difference between "the" proximate cause and "a" proximate cause); and *Yoost v. Caspari*, 295 Mich.App. 209, 229, 813 N.W.2d 783, 795 (2012) (Holding that "any" has been interpreted to "include[ ] 'each' and 'every.'  It comprehends 'the slightest.' (citation omitted)).

The difference between the use of "any" versus "the" is particularly important in the context at hand, in which multiple discharges are potentially implicated.  Under the contract language in the Travelers Policies, even if there were two discharges out of which the property damage arises, coverage is precluded if either discharge was expected or intended.  That is the clear, plain meaning of the word "any" as used in the phrase "property damage arising out of any emission, discharge . . . ."  *Yoost*, at 229.

Secondly, and setting aside the difference in language, the *Kent County* Court's disregard of Michigan's adherence to the plain-meaning approach to insurance contract interpretation finds

no support in any other Michigan decision. Indeed, the analysis in *Kent County* does not purport to rely on any other Michigan authority. Rather, the court purported merely to distinguish *City of Woodhaven*, *Traverse City*, and *Clare* on their facts, while citing no other Michigan appellate decision that supported its rationale. The court's adoption of an "equivalent of a container" exception was premised mainly on a federal decision purporting to apply Wisconsin law, *Patz v St. Paul Fire and Marine Ins. Co.*, 15 F.3d 699 (7th Cir. 1994). *See Kent County* at 275-279. There is no indication, however, that Wisconsin adheres to the plain-meaning approach to insurance contract interpretation in the same manner as does Michigan. In fact, as one court has helpfully noted in discussing this very topic, "[m]ost courts confronting the issue of whether placing pollutants into a landfill constituted a discharge have not recognized a 'container' exception." *Harris Corp. v. Travelers Indem. Co.*, 1998 W.L. 1657171 (M.D. Fla. 1998), citing *Millipore Corp. v. Travelers Indem. Co.*, 115 F.3d 21, 33 (1st Cir. 1997).[10]

The court in *Harris* appropriately recognized that the *Patz* analysis should have no applicability in jurisdictions (such as Michigan) that focus on the plain meaning of the insurance contract language. As the Court in *Harris* explained:

> The *Patz* court's "container" exception to the initial discharge rule may be supported by the public policy of punishing intentional polluters while rewarding companies that attempt to dispose of waste legally. However, the "container" exception finds no support in the insurance policies relevant in this case.

---

[10] *See also St. Paul Fire and Marine Ins. Co. v. Warwick Dyeing Corp.*, 26 F.3d 1195, 1202 (1st Cir. 1994); *Broderick Investment Co. v. The Hartford Accident and Indem. Co.*, 954 F.2d 601, 607 (10th Cir. 1992); and *Indiana Gas Co., Inc. v. Aetna Cas. and Surety Co.*, 951 F. Supp. 797, 805 (N.D. Ind. 1996), *vacated on other grounds*, 141 F.3d 314 (7th Cir. 1998) (noting that the result in *Patz* was required by Wisconsin state law and rejecting the "container" exception under Indiana law)).

18

*Id.* at *5.[11]  Similarly here, the "container" exception, and the focus on the "relevant" discharge, find no support in the policy language, which applies so long as the property damage arises out of *any* discharge that is either expected or intended.

Since the *Kent County* decision was issued in 1996, the Michigan Supreme Court has repeatedly emphasized the need to focus on the plain meaning of insurance contract language.  In *Rory,* for example, the Court recognized that "[w]hen a court abrogates unambiguous contractual provisions based on its own independent assessment of 'reasonableness,' the court undermines the party's freedom of contract."  *Rory* at 468-469.  *See also Wilkie v. Auto Owners Ins. Co.*, 469 Mich. 41, 51-52; 664 N.W.2d 776 (2003) (abolishing the reasonable expectations doctrine as contrary to bedrock principle of American contract law that parties are free to contract as they see fit, and courts are to enforce contract language as written); *Zahn v. Kroger Co. of Michigan*, 483 Mich. 34, 41; 764 N.W.2d 207 (2009) ("courts may not make a new contract for parties under the guise of a construction of the contract, if doing so will ignore the plain meaning of words chosen by the parties.").

Another problem with the *Kent County* analysis is found in its attempt to distinguish other Michigan appellate decisions involving pollution exclusions.  The court purported to distinguish *Traverse City* on the grounds that, "In contrast to… *Traverse City*, the plaintiff (in *Kent County*) acted within the bounds of the law."  *Kent County* at 269.  But the relevant discharge into the quarry in *Traverse City* was done *before* there was any indication of illegality.  The first cease-and-desist order requiring the plaintiff to discontinue using the gravel pit to dump fly ash was in 1988, long after the insurance contracts expired.  Nor is there any suggestion of illegality in the spraying of pesticides in *City of Woodhaven.*  Again, it is not the legality of the discharge that

---

[11] The policy language at issue in *Harris* was the same language that is at issue in this case.  *See, Id.*, *3.

dictates the applicability of the pollution exclusion.  All that matters is that *any* discharge was expected or intended.  Simply put, *Kent County's* attempt to distinguish Michigan cases applying the initial-discharge rule is unavailing.

Another difficulty with the holding in *Kent County* is the court's unwarranted leap from the concept of a container (like a steel barrel or drum) containing waste being placed in a landfill to the entire landfill itself becoming the container or  "the equivalent of a container" with respect to any waste dumped directly into it.  *Kent County* at 269.  No Michigan Supreme Court authority supports the conclusion that there is a "container" exception to the initial-discharge rule—much less an amorphous "equivalent of a container" exception.  Here again, *Kent County* runs afoul of the Supreme Court's decision in *City of Woodhaven.*  There is no indication in *City of Woodhaven* that the insured expected the pesticides sprayed into the atmosphere to cause bodily injury, or even to travel to a place where bodily injury could be caused.  That, however, is not the inquiry. The inquiry is whether there was a discharge out of which property damage ultimately arose, regardless of whether there was any intent or expectation that the waste was discharged in such a way, or in such a place, as to insulate against property damage.

To the extent the Court is inclined to look to intermediate appellate decisions to predict what the Michigan Supreme Court would hold in this context, *Traverse City* is a better source than *Kent County.*  That decision, authored by then Judge, later Chief Justice Taylor, involved the discharge of fly ash into a gravel pit from 1975 to 1987.  In the early 1980s, the insured began taking steps to obtain a license, which required it to conduct tests on the fly ash and the ground water at the pit.  In 1987, the Michigan Department of Natural Resources denied the license, concluding that the fly ash, when combined with precipitation, could leach into the underground aquifer and cause contamination.  *Id.* at 114.  The insured sought coverage under policies in effect

from 1975 to 1984—before there was any conclusion that the fly ash could leach out of the pit and cause contamination. *Id.* Despite the absence of any indication that the pit was known or suspected to be susceptible to leaching, the court held that the initial-discharge rule set forth in *City of Woodhaven* controlled. *Id.* at 117. Because the initial discharge into the pit was expected or intended, coverage was precluded.

*Traverse City* is directly on point. Unlike the panel that decided *Kent County,* the court in *Traverse City* correctly recognized that the initial-discharge rule from *City of Woodhaven* governs cases involving the discharge of materials into the ground, whether a landfill or a gravel pit, and faithfully applied that Michigan Supreme Court precedent to resolve the dispute before it.[12]

Under Michigan's plain-meaning approach to insurance contract interpretation, the pollution exclusion applies so long as the property damage arose out of the initial discharge into the landfill. The "equivalent of a container" exception adopted in *Kent County* finds no support in the contract language, or in Michigan jurisprudence, and, therefore, should be disregarded.

### 3. The majority, plain-meaning approach rejects a "container" exception.

Cases from other jurisdictions that have addressed the application of pollution exclusions like that found in the Travelers Policies to the discharge of material into a landfill or its equivalent have generally rejected the "container" approach proposed by *Patz* and adopted in *Kent County*. The *Kent County* court itself acknowledged three such cases, *Broderick, Warwick Dyeing,* and *Oklahoma Publishing Co. v. Kansas City Fire and Marine Ins.*, 805 F. Supp. 905, 910 (W.D. Okla, 1992). *See Kent County*, at 282-283.[13] Particularly given its strong adherence to the plain-

---

[12] Also, as discussed above, the court in *Kent County* erred in its attempt to distinguish *Traverse City* on its facts. That fact alone makes *Traverse City* a better predictor than *Kent County* of whether the Michigan Supreme Court would apply the initial-discharge rule in this context.

[13] *See also, e.g., Mays v. Transamerica Ins. Co.*, 103 Or.App. 578, 585; 799 P.2d 653 (Or.App. 1990) ("The evidence is clear that Velco intended to release the pollutants into the waste pit as a

meaning approach to insurance contract language interpretation as expressed in recent years, Michigan's Supreme Court likely would follow the majority rule on this point, and reject the "equivalent of a container" exception adopted in *Kent County.*

II.     **The Relevant Discharge in this Case is the Discharge of Waste *into* the Landfill Because the ASTL Undisputedly was not a State of the Art Contained Area or Structure.**

Even if the Court is inclined to apply the "equivalent of a container" exception espoused by *Kent County,* Travelers is nevertheless entitled to summary judgment. According to *Kent County,* the discharge from the landfill into the surrounding area will be deemed the "relevant" discharge *only if* the landfill was state of the art, *i.e.,* purposefully designed and constructed to contain the waste. *Kent County* at 271. *See also City of Albion* at 852. The *Kent County* court summarized its holding as follows:

> In summation, application of the pollution exclusion requires that the court focus on the initial discharge into the environment. If that discharge is intended, there is no coverage, notwithstanding that the damage may have been unintentional. If waste materials are placed in a contained area or structure and later escape into the environment, the latter discharge is the relevant discharge.

*Id.* at 288. In *Kent County*, the court found that waste was placed into an engineered landfill that was "state of the art," licensed and believed to be capable of containing the waste placed in it. *Id.* at 270-271. In *City of Albion,* relying on the *Kent County,* the court concluded that "the relevant

---

regular part of its business operations. The pollution exclusion clause precludes coverage [regardless of whether the subsequent migration was also expected or intended]."); *Emerson Enters., LLC v. Kenneth Crosby New York, LLC*, 768 F. Supp. 2d 484, 491-92 (W.D.N.Y. 2011) (enforcing "expected or intended" pollution exclusion and granting summary judgment in Travelers' favor based on initial discharge into dry well, even if subsequent overflow from well was accidental); *Town of Union v. Travelers Indem. Co.*, 906 F. Supp. 782, 787 (N.D.N.Y. 1995) (granting summary judgment to Travelers because initial discharge into landfill was "expected or intended"); *Travelers Ins. Co. v. Waltham Indus. Labs. Corp.*, 883 F.2d 1092, 1097-99 (1st Cir. 1989); *Damar, Inc. v. U.S. Fire Ins. Co.*, 856 F. Supp. 679, 682 (N.D. Ga. 1993), *aff'd* 21 F.3d 1126 (11th Cir. 1994); *Anaconda Minerals Co. v. Stoller Chem. Co.*, 773 F. Supp. 1498, 1506 (D. Utah 1991); *Fruit of the Loom, Inc. v. Travelers Indem. Co.*, 284 Ill. App. 3d 485, 498 (1st Dist. 1996).

discharge in this case will be the release from the Landfill into the environment *if* the City is able to establish that the Landfill was licensed by the State of Michigan and designed and constructed in accordance with then-contemporary standards in order to contain the contents that were to be placed in the Landfill." *City of Albion* at 852.[14]

Importantly, even under the *Kent County* analysis, the discharge *from* the landfill will be deemed the relevant discharge only if the landfill was state of the art.  This state of the art requirement has been described as requiring the landfill design to be "the product of engineering studies that concluded that the design was effective to contain the contaminant." *Aero-Motive Co. v Great American Ins.,* 302 F.Supp.2d 738, 741-742 (W.D. Mich., 2003 (J. Quist)).

Discovery here has revealed that the ASTL was undisputedly not designed or constructed to contain waste and could not possibly be characterized as state of the art at the time Decker dumped contaminants there.  At a minimum, discharge, seepage, or release at the ASTL was expected from the standpoint of Gordon Stevick, the landfill owner.

As noted, it is undisputed that by 1966 when the ASTL began operating it was known and understood by those in the engineering, environmental and waste disposal industries that soil or groundwater contamination was likely to result from the disposal of waste into non-engineered landfills that were operated in unsuitable locations.  (Ex. F, Opinion 1; Ex. Y, pp. 23, 31; Ex. AA, pp. 44-46).  Thus, by 1966 construction of a state of the art landfill would have required, at a minimum, the selection of a more suitable location for the ASTL.  (Ex. F, Opinion1; Ex. Y, pp. 30-31; Ex. AA, p. 45).  As Sullivan testified, "The point is the state of the knowledge was there that this was a poor location, and it could impact groundwater." (Ex. Y, p. 31).

It is also undisputed that the ASTL, unlike the landfill in *Kent County,* was not an

---

[14] The *City of Albion* case was settled before a determination was made as to whether the ASTL was state of the art.

engineered structure and was not designed to contain waste. (Ex. F, Opinion 2; Ex. Y, pp. 18, 22, 31; Ex. Z, ¶2; Ex. AA, pp. 45-46; Ex. H, section C.2). No engineering or operational plans exist for the ASTL. (Ex. I, pp. 58; Ex. M). If anything, the ASTL was the antithesis of "state of the art"; it was nothing more than a large, unlined hole or pit that had been dug into the bare ground into which solid, semi-solid and liquid waste was routinely and directly dumped. (Ex. F, Opinion 2, pp. 10-11, 16-17; Ex. J, pp. 57-60; Ex. O, pp. 16-17.

The predominant soil type in the unsaturated soils beneath the waste in the ASTL is sand. (Ex. H, section E; Ex. I, p. 30; Ex. J, p. 57-58). The nature of the sandy soil in and beneath the ASTL was such that it was incapable of containing or limiting the migration of liquid wastes and leachate from the ASTL. (Ex. F, Opinion 2; Ex. H). Unlike in *Kent County,* there was no barrier, artificial or otherwise under the ASTL. (Ex. G; Ex. B, p. 4; Ex. H).

Decker's own expert's report confirmed that the bottom of the ASTL was less than ten feet from groundwater, and that some of the waste was in ***direct contact*** with groundwater. (Ex. H, section C.3.). Indeed, Graham's report concluded that in the areas of the landfill where waste is within the groundwater, "leachate is released into the groundwater instantaneously." (Ex. H, section E.) Further, in areas whether there is a ten foot distance between the waste and the ground water table the leachate reached the groundwater in "about 1/3 of a day or less." *Id.*

Mr. Havens further testified that the bottom of the ASTL excavation, at two feet from the water table (as described on the topographic map prepared in 1966 (Ex. L)) was far too close to the water table for there to be any containment of wastes. (Ex. J, p. 101). Further, and again unlike in *Kent County,* the ASTL suffered from operational and maintenance problems, including repeated failures to apply proper coverage to the fill areas and leachate generation. (Exs. P-T).

In sum, there was nothing "state of the art" about the ASTL. The ASTL was indisputably

not designed to contain waste, and it was undeniably not a container.  It was, in fact, a sieve.  As Sullivan testified, "…arguably this was about as bad a landfill site, the Albion Township Landfill, that you could have had."  (Ex. Y, pp. 27-28).

In addition, the discharge, seepage, release or escape of waste at the ASTL was clearly at least expected from the standpoint of "any person or organization for whose acts or omissions any insured is liable." (Exhibit BB).   Thus, under the plain language of the pollution exclusion, coverage is precluded for this separate reason as well.  *See, e.g., Providence Journal Co. v. Travelers Indem. Co.,* 938 F.Supp. 1066 (D.R.I. 1996) (enforcing the Travelers pollution exclusion based on CERCLA liability imposed on insured where waste transporter expected or intended the discharges of waste).  Gordon Stevick, the landfill owner, unequivocally knew that waste material was being dumped in the pond and on the soil at the ASTL from 1966 to 1981.  He was the ASTL owner and operator. (Ex. D, p. 2 ; Ex. O, pp. 7, 16).   Stevick undisputedly expected if not intended the discharge of waste to the ASTL.   Further, Decker's employees themselves intended to dispose of its waste in the ASTL.  Konkle and Coleman both testified that Decker employees hauled Decker's waste "to the dumpsite" approximately once a week and dumped in directly into the ASTL.  (Ex. U, pp.60, 66-69; Ex. V, pp. 59-61).

Because the pollution exclusion applies even if the discharge *from* the landfill is deemed the "relevant" discharge, Travelers is entitled to summary judgment for this reason as well.

## <u>CONCLUSION</u>

For all of the reasons set forth above, Travelers requests entry of summary judgment in its favor declaring as a matter of law that coverage for the Underlying Claim is precluded by the pollution exclusion in the Travelers Policies.  Travelers further requests any and all other relief to which it is entitled.

Respectfully submitted,

PLUNKETT COONEY, P.C.

By:     *s/Nicole E. Wilinski*
        Charles W. Browning (32978)
        Jeffrey C. Gerish (P51338)
        Nicole E. Wilinski  (P61904)
        38505 Woodward Avenue, Suite 2000
        Bloomfield Hills, MI  48304
        (248) 901-4000
        cbrowning@plunkettcooney.com
        jgerish@plunkettcooney.com
        nwilinski@plunkettcooney.com

        *Attorneys for Travelers*

Dated:  November 14, 2014

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 14th day of November, 2014, I electronically filed a copy of the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

Phillip M. Moilanen at <u>moilanen@dmci.net</u>

*s/Nicole E. Wilinski*
Nicole E. Wilinski

Open.06900.31965.14779551-1

27