UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DECKER MANUFACTURING
CORPORATION,

        Plaintiff,

                                  Case No.  1:13-CV-820

v.

                                    HON. ROBERT HOLMES BELL

THE TRAVELERS INDEMNITY
COMPANY,

        Defendant.

_____/

# O P I N I O N

      This is an action between Decker Manufacturing Corporation and its insurer,

Travelers Indemnity Company, to resolve questions concerning insurance coverage for

Decker's response to environmental issues arising out a landfill used by Decker.  Plaintiff

Decker seeks damages and a declaratory judgment associated with Travelers' alleged duty

to defend and indemnify Decker. (Compl., ECF No. 1-1.) Travelers has filed a counterclaim

seeking a declaratory judgment that it has no obligation to defend or indemnify Decker with

respect to the landfill and for reimbursement of defense costs it paid under a reservation of

rights.  (ECF No. 8.)  Currently pending are Travelers' motion for summary judgment based

on the pollution exclusion (ECF No. 56), Decker's motion for summary judgment on

Travelers' counterclaim  (ECF No. 57), Decker's motion for summary judgment on its

complaint (ECF No. 58), and Travelers' corrected motion for partial summary judgment on

trigger and allocation (ECF No. 66).

## I.

Decker is a Michigan corporation with its principal office and place of business in the City of Albion, Calhoun County, Michigan.   From 1966 to 1981, Decker disposed of its waste materials at the  Albion Sheridan Township Landfill (the "Landfill" or "ASTL").  The Landfill was closed in 1981.  Decker was insured under a comprehensive general liability insurance policies issued by Travelers for the four-year period from January 1, 1973, through January 1, 1977 (the "Policies").[1]

After the Landfill was closed, the United States Environmental Protection Agency ("EPA") placed the Landfill on the National Priority List as a Superfund Site.  On September 23, 1988, the EPA issued its first request for information from Decker pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") § 104(e).  (ECF No. 71-7.)  An April 2, 1992, the EPA issued a supplemental request for information.  (ECF NO. 71-9.)  On June 6, 1995, the EPA sent Decker a Special Notice of Liability asserting that Decker was a potentially responsible party ("PRP") who would be responsible, along with others, for remediation costs connected with cleanup of the Landfill. On October 11, 1995, the EPA issued a Unilateral Administrative Order ("UAO") requiring

---

[1]The relevant Policies are Policy No.  650-2406865-IND/650-822A082-2-IND, effective Jan. 1, 1973 to Jan. 1, 1975 (the "1973-75 Policy"); Policy No. 650-822A-140-1-IND, effective Jan. 1, 1975, to Jan. 1, 1976 (the "1975-1976 Policy"); and Policy No. 650-822A140-1-IND, effective Jan. 1, 1976, to Jan. 1, 1977 (the "1976-1977 Policy").  The Policies carry a $1,000,000 limit of liability .

Decker and three other parties (Cooper Industries, Corning, Inc., and the City of Albion) to take certain remediation activities with respect to the Landfill, including removal of drums, construction of a landfill cap, and monitoring of groundwater. (Sullivan Rpt. ¶ 2.0, ECF No. 62-8.) There was no requirement for treating the groundwater. Decker notified Travelers of the EPA's UAO on November 14, 1995. (Moilanen 10/27/95 Letter, ECF No. 71-6.) Travelers responded that it did not have a duty to defend or indemnify Decker in this matter. (Travelers 3/19/96 Letter, ECF No. 61-9.)

In 1998 Decker was joined in the EPA's litigation against the City of Albion, *United States of America v. City of Albion, Michigan*, Case No. 1:97-CV-1037 (W.D. Mich.) ("EPA Lawsuit"), on claims filed by Cooper Industries, Corning Glass, and the City of Albion. Decker entered into a consent decree in the EPA litigation which became effective on July 2, 1999. (Compl. ¶ 115.) The consent decree expressly denies liability, but requires Decker to reimburse the EPA for past and future response costs, and to finance and perform Operation and Maintenance ("O&M") activities for thirty years.[2] (Consent Decree at 3, 13-14, ECF No. 71-5; O&M Plan, ECF No. 75-2.) On March 25, 1999, the State of Michigan advised Decker it was asserting a right to reimbursement for past defense costs incurred at the ASTL. (MDEQ 3/25/99 Letter.) Decker notified Travelers of the federal court action on March 17, 1998. (Klaasen 3/17/98 Letter, ECF No. 71-18.) Travelers initially declined to

---

[2]Although the O&M Plan references a 20-year schedule for monitoring events (O&M Plan, § 3.2.9, ECF No. 75-2), the parties appear to be in agreement that the monitoring obligations are to continue for 30 years, or until 2028.

defend or indemnify Decker.  However, in February 1999, Travelers agreed to contribute to the payment of legal fees for defense of Decker under a reservation of rights.  (Travelers Letters, 2/15/99, 2/23/99, ECF No. 61-14.)  Travelers paid $98,067.00 toward Decker's defense costs.  (Answ. to CounterCl. ¶ 34, ECF No. 18.)

Decker filed this action in the Calhoun County Circuit Court against Travelers for breach of contract and declaratory relief.  Decker has demanded that Travelers reimburse it for alleged defense and indemnity costs related to the Landfill, including past and future costs arising out of its obligations under the Consent Decree.  Decker also has demanded that Travelers defend and indemnify Decker from any and all new claims that may be brought against Decker relating to the Landfill.  Travelers removed the case to federal court on the basis of diversity of citizenship.  (ECF No. 1.)  Travelers has filed a counterclaim seeking a declaratory judgment that it has no obligation to defend or indemnify Decker with respect to the Landfill Site, and for reimbursement of defense costs it paid under a reservation of rights.  (ECF No. 8.)

## II.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If

the moving party carries its burden of showing there is an absence of evidence to support a claim, then the nonmoving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).  The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient to create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

### III.

Travelers has moved for an order granting summary judgment that the pollution exclusion in the Travelers Policies precludes insurance coverage for Decker's defense and indemnity costs related to the Landfill.  Decker opposes the motion and has requested that the Court grant summary judgment in its favor on the pollution exclusion.

In determining whether an insured is entitled to insurance benefits, a court is generally required to determine first whether coverage exists, and then whether an exclusion precludes coverage.  *Allstate Ins. Co. v. Freeman*, 443 N.W.2d 734, 740 (Mich. 1989).  However, because Travelers contends that the pollution exclusion is dispositive of all of the issues in this case, the Court will address it first.

Travelers, as the insurer, bears the burden of proving that an exclusion to coverage

applies. *Heniser v. Frankenmuth Mut. Ins. Co.*, 534 N.W.2d 502, 505 n.6 (Mich. 1995) (citing *Arco Indus. Corp. v. Am. Motorists Ins. Co.*, 531 N.W.2d 168, 182 (Mich. 1995) (Boyle, J., concurring)).

Under the Policies, Travelers agreed to pay "all sums which the insured shall become legally obligated to pay as damages because of (a) bodily injury; or (b) property damage; to which this insurance applies, caused by an occurrence." (ECF Nos. 9-14.) However, each of the insurance policies contains a pollution exclusion that precludes insurance coverage for property damage arising out of any discharge of any waste or pollutant that is "either expected or intended from the standpoint of any insured or any person or organization for whose acts or omissions any insured is liable."[3] Accordingly, for purposes of this motion,

---

[3]The 1973-1975 Policy provides the following exclusion:

LIMITATION OF COVERAGE FOR POLLUTION - MICHIGAN

It is agreed that the insurance does not apply

(a) to bodily injury or property damage arising out of any emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant

> (1) if such emission, discharge, seepage, release or escape is either expected or intended from the standpoint of any insured or any person or organization for whose acts or omissions any Insured is liable; or (2) resulting from or contributed to by any condition in violation of or non-compliance with any federal rule, regulation or law applicable thereto;

but this exclusion (a) does not apply to property damages arising out of any emission, discharge, seepage, release or escape of petroleum or petroleum derivatives into any body of water;

(continued...)

the issue is whether the property damage at the Landfill arose from any discharge of waste that was expected or intended from Decker's standpoint.

Travelers contends that because Decker intentionally discharged its waste into the Landfill, the pollution exclusion precludes insurance coverage. Decker contends that the pollution exclusion does not apply because Decker placed its waste in what it believed was a safe and secure location, and Decker did not expect or intend that the waste would leave the Landfill.[4] The parties' opposing positions require the Court to consider whether, for

_____

[3](...continued)
(b) to property damage arising out of any emission, discharge, seepage, release or escape of petroleum or petroleum derivatives into any body of water, but this exclusion (b) does not apply to property damage resulting from fire or explosion arising out of any emission, discharge, seepage, release or escape which neither

> (1) is expected or intended form the standpoint of any insured or any person or organization for whose acts or omissions any insured is liable, nor
>
> (2) results from or is contributed to by any condition in violation of or non-compliance with any federal rule, regulation or law applicable thereto.

(1973-1975 Policy, ECF No. 59-30, Page ID#1026.) The 1975-1976 and 1976-1977 Policies included essentially identical provisions. (ECF No. 59-32, Page ID#1128-29, 1131; ECF No. 59-33, Page ID#1200, 1205.)

[4]Decker has also raised an argument that the pollution exclusion does not apply because there is no evidence to support the EPA's claim that there is a causal connection between the small amount of waste that Decker placed into the landfill and the property damage claimed by the EPA. This argument is confusing. Inasmuch as Decker is requesting Travelers to reimburse it for costs incurred in defending and settling the EPA's claims, the purported absence of evidence to support the EPA's claims is not only irrelevant to the issue of whether Decker has alleged a covered claim, but it is also irrelevant to the issue of the application of the pollution exclusion under the Policies.

7

purposes of the pollution exclusion, the relevant "discharge" is Decker's initial placement of its waste into the Landfill, or the escape of waste from the Landfill.

A.  Discharge Under The Pollution Exclusion

As a federal court sitting in diversity, this Court is required to apply the substantive law of Michigan, the forum state. *Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 607 (6th Cir. 2012) (citing *CenTra, Inc. v. Estrin*, 538 F.3d 402, 409 (6th Cir. 2008)).  The Michigan Supreme Court has held, in the context of spraying insecticides, that the relevant discharge under the pollution exclusion is "the initial discharge, dispersal, release, or escape *into* the atmosphere and not the subsequent migration." *Protective Nat. Ins. Co. of Omaha v. City of Woodhaven*, 476 N.W.2d 374, 377 (Mich. 1991) (emphasis in original).  In *Woodhaven*, a third party brought an action against the city for damages resulting from exposure to pesticides the city had sprayed into the air as part of a municipal insect control program.  The insurance company denied the city's request for coverage on the basis of a pollution exclusion similar to the exclusion found in Travelers' Policies.  According to the Michigan Supreme Court, application of the pollution exclusion depends solely upon the method by which the pollutants entered the environment, not the behavior of the pollutants in the environment after release. *Id.*

*Woodhaven* did not involve discharges into a landfill.  After *Woodhaven*, in a per curiam opinion, the Michigan Supreme Court explicitly declined to rule on whether, in the context of pollution at a landfill site, the proper focus for determining the applicability of a

8

pollution exclusion is the discharge *from*, rather than *into*, the landfill.  *Auto Owners Ins. Co. v. City of Clare*, 521 N.W.2d 480, 486 n.12 (Mich. 1994) (per curiam).  The court did not have to address *Woodhaven*'s "initial discharge rule" because the result would have been the same whether it focused on the discharge *into* or the discharge *from* the landfill.  *Id.*

Because the Michigan Supreme Court has not yet addressed the precise issue of the relevant discharge for purposes of applying the pollution exclusion in the context of a landfill, this Court must "predict how the court would rule by looking to all the available data."  *Berrington v. Wal–Mart Stores, Inc.*, 696 F.3d 604, 608 (6th Cir. 2012) (citation and internal quotation marks omitted).

After the Michigan Supreme Court declined to address the issue in *City of Clare*, the Michigan Court of Appeals was called on to determine whether the pollution exclusion barred insurance coverage for a plaintiff that had disposed of its fly ash, a waste material produced by its electrical generation plant, at an abandoned, unlicensed gravel pit from 1975 to 1987.  *Traverse City Light & Power Bd. v. Home Ins. Co.*, 530 N.W.2d 150, 151 (Mich. Ct. App. 1995).  The Court of Appeals held that the initial discharge rule articulated in *Woodhaven* applied to the case.  The court accordingly focused on "the initial discharge or placement of the materials into the gravel pit, not on their alleged subsequent migration into the soil."  *Id.*  Central to the court's analysis was its determination that the plaintiff's disposal of the fly ash into the gravel pit was an initial discharge of the material into the environment. *Id.* at 153.

9

The following year the Michigan Court of Appeals considered the pollution exclusion in the context of a licensed landfill.  *Kent Cnty. v. Home Ins. Co.*, 551 N.W.2d 424 (Mich. Ct. App. 1996).  The facts, viewed in a light most favorable to the plaintiff, were that when the landfill began operating it was a "state of the art facility licensed to receive solid waste only."  *Id.* at 427.  The solid waste materials were covered with six inches of dirt each night.  *Id*. at 428.  The landfill was not artificially lined, but a seven-foot soil barrier separated the bottom of the landfill from groundwater.  *Id.*  The designer of the landfill believed that the soil barrier was sufficient to contain the waste and any contaminants.  *Id.* at 433.  The court held that for purposes of the pollution exclusion, the initial discharge was the discharge from the engineered landfill into the environment, rather than the discharge into the landfill.  *Id.* at 441-42.

*Kent County* did not overrule *Traverse City*.  It is more in the nature of a refinement of the analysis in *Traverse City*.  *Kent County* distinguished discharges of contaminants into the environment (the atmosphere in *Woodhaven* and the gravel pit in *Traverse City*), where the focus is on the initial discharge, from the placement of contaminants in a container, where the focus is on the release of the contaminants into the environment from the container.  *Id*.  The court determined that the placement of contaminants into a licensed engineered landfill believed to be adequate to contain the materials was like the placement of contaminants into a container.  *Id.* at 432-33.  Accordingly, for purposes of the pollution exclusion, the relevant discharge was the discharge from the landfill.  The court distinguished

*Traverse City* on the basis that the gravel pit was not engineered to be a contained area and the plaintiff disposed of its waste in the gravel pit without any regulatory approval. *Id.* at 434. "[A]lthough there may not have been an expectation that the contaminants would migrate to the extent they did, the initial discharge into the unlicensed gravel pit was a discharge directly into the environment. There is no indication that the gravel pit in *Traverse City* was engineered to be, or believed to be, a contained area." *Id.* at 433. The *Kent County* court summarized its opinion as follows:

> [A]pplication of the pollution exclusion requires that the court focus on the initial discharge into the environment. If that discharge is intended, there is no coverage, notwithstanding that the damage may have been unintentional. If waste materials are placed in a contained area or structure and later escape into the environment, the latter discharge is the relevant discharge. In the instant case, the relevant discharge is the release of the pollutants from the landfill.

*Id.* at 441.

The following year, the Michigan Court of Appeals again considered the pollution exclusion as applied to several licensed landfills, the first of which was created in 1967 at a site that had previously been used as a sand and gravel mine. *S. Macomb Disposal Auth. v. Am. Ins. Co.*, 572 N.W.2d 686, 691-92 (Mich. Ct. App. 1997). The water table at the site was high, there was no artificial barrier, and the geologist who investigated the site was not enthusiastic about using the site as a landfill because of anticipated leachate problems. Nevertheless, for purposes of the pollution exclusion, the court held that the relevant discharge was the discharge from the landfill rather than the placement of the waste into the landfill. *Id.* at 703. The court explained its decision as follows:

11

The landfills were designed consistent with then-contemporary standards. Experts testified that plaintiff responded sufficiently to the outbreaks under those standards. From the outset of their operations, these landfills, although approved by the DNR, were fraught with problems arising from their operation and maintenance. These continuing problems, however, do not render it improper to focus on the discharge of contaminants from the landfills. The refuse was placed into the landfills that had been constructed to contain the waste. Consistent with the holding in *Kent Co.*, we agree that the proper focus is the leaking of leachate and contaminants from the landfill into the surrounding soil and groundwater because the refuse had been placed into a landfill designed and licensed to contain waste.

*Id. See also City of Albion v. Guaranty Nat. Ins. Co.*, 73 F. Supp. 2d 846, 852 (W. D. Mich. 1999) (Quist, J.) (holding that for purposes of the "sudden and accidental" exception to the pollution exclusion, the relevant release was the release from the Landfill into the environment if the Landfill was licensed by the State and designed and constructed in accordance with then-contemporary standards).

Travelers urges the Court not to follow *Kent County* and *South Macomb.* Travelers contends these cases are distinguishable because the policies at issue referenced "the discharge," while the Travelers Policies in this case reference "any discharge." For purposes of applying the pollution exclusion, the distinction between the terms "the" and "any" is not material. Whether a policy refers to "the" discharge or "any" discharge, under *Woodhaven* the question is the same: whether there was a discharge "to the environment."

Travelers also contends that *Kent County* and *South Macomb* should not be followed because their analysis is flawed and would not likely be followed by the Michigan Supreme Court. The Court disagrees. First, as noted in *Berrington*, "decisions by 'the Michigan Court

12

of Appeals are binding authority where the Michigan Supreme Court has never addressed the issue decided therein." *Berrington*, 696 F.3d at 607 (quoting *Morrison v. B. Braun Med. Inc.*, 663 F.3d 251, 257 n.1 (6th Cir. 2011)). The Michigan Supreme Court has explicitly declined to address the issue of the application of the *Woodhaven* initial-discharge rule to landfills. Accordingly, the Court of Appeals cases are currently the best indication of Michigan law. Second, the Court is not persuaded that the analysis in *Kent County* and *South Macomb* is flawed. These cases are well-reasoned and do not stray from other relevant Michigan Supreme Court authority. They are consistent with *Woodhaven* and *Traverse City*. They merely They merely refine the analysis in *Woodhaven* and *Traverse City* to apply to different factual scenarios. The issue for this Court's consideration is not whether to follow the *Kent County* line of cases, but whether the facts of this case are more like the facts of *Woodhaven/Traverse City* or the *Kent County* line of cases.

B. The Landfill

There is no material dispute of fact concerning the facts regarding the Landfill. The Landfill was located on the site of a previous sand and gravel pit. The Landfill was privately operated by Gordon Stevick from 1966 to 1981 under a contract with the City of Albion to provide a sanitary landfill waste disposal yard for the City's residents and industries. (Stevick- Albion Agrmt., Pl. Ex. V, ECF No. 72-2.) The City of Albion included a charge on the property tax bill to pay for the Landfill's operation, so all the industries and residents within the City used the Landfill for their refuse. (Konkle Dep. 65; Konkle Aff. 9.)

The Landfill was licensed by the State of Michigan Department of Public Health as a solid waste disposal area every year from 1966 when it was opened, until 1981 when it was closed. (Licenses, ECF No. No. 61-4; Sullivan Dep. 30, ECF No. 59-27.) In the early 1970s, the Michigan Department of Natural Resources ("MDNR") approved the Landfill to accept an estimated 6,000 cubic yards of metal plating sludges. (US EPA Third Five Year Review Report § 3.3, ECF No. 59-4.) During its operation, the State of Michigan and Calhoun County subjected the Landfill to several inspections.

The Landfill accepted municipal refuse and industrial wastes from households and industries in the City of Albion and nearby townships, including household refuse, industrial waste, paint wastes and thinners, oil and grease, dust, sand and dirt containing fly ash, casting sand and metallic sludges associated with metal plating activities. (Douthit Rpt. ¶ 7; Graham Rpt. ¶ C.1; Sullivan Rpt. ¶ 2.0.)

Landfill operations consisted of excavating trenches, filling the trenches with waste brought to the site by residents and company employees, and covering the trenches with sand at the end of the day. The bottoms of the trenches were either in direct contact with the water table or within a few feet of the water table. In the last years of the Landfill's operation, wastes were often dumped on top of the ground. There was a pond located on the landfill where two companies disposed of liquid wastes, mostly from washing machinery. (Wilkinson Dep. 7-11; Graham Rpt. ¶ C.1; Havens Dep. 57.)

Both parties' experts agreed that the Landfill was not an engineered structure. The

14

Landfill is built on sandy soils that are inherently permeable.  There is no continuous clay layer beneath the site that is sufficient to isolate the landfill.  The sandy soil was incapable of containing or limiting the migration of liquid wastes or landfill leachate.  Groundwater is encountered throughout the Landfill site at depths of 10 to 30 feet below the surface.  In some locations the groundwater is in direct contact with the refuse, and in others it is separated by ten feet.  The Landfill was not designed to prevent - and did not prevent - the migration of waste constituents to soil or ground water.  (Graham Rpt. ¶ C; Graham Dep. 18; Sullivan Rpt., Op. 2; Douthit Dep. 46; Havens Dep. 101-02; Sullivan Dep. 31-32.)

Decker disposed of its wastes at the Landfill from 1966 to 1981, the entire time that the Landfill was operative.  Decker's waste included Floor-Dri mixed with oil, paper, magazines, broken wood pallets, and sludge the consistency of mud that could be pumped. (Konkle Dep. 28-30.)  The sludge consisted of oil residue, lime soap, and metal shavings. (*Id.* at 30.)  Decker collected its waste in a gondola.  (Coleman Dep. 60.)  Decker's maintenance department hauled the gondola to the Landfill once a week and tipped the gondola to dump the waste directly into the Landfill. (*Id.* at 58-59, 61.)

There is no evidence that Decker was aware of any problems with or discharges from the Landfill.  The public was not notified about unfavorable inspections.  (Zulewski Dep. 106; Sullivan Dep. 71-72.)  Bernard Konkle began working for Decker immediately upon graduating from high school in 1949, and has worked in various capacities at Decker until his retirement in 2011, except for 4 years in the Air Force.  (*Id.* at 10-13; Konkle Aff. ¶ 2.)

He is currently chairman of the board of Decker Manufacturing.  (Konkle Dep. 8; Konkle

Aff. ¶ 2.)  Konkle did not know anything about whether the Landfill had a liner, and did not

know of any environmental problem associated with the Landfill prior to the Landfill's

closing.  (Konkle Aff. ¶ 8.)  Based on his dealings with the City, Konkle understood and

believed that Decker's use of the Landfill for disposal of its was lawful and proper.  (Konkle

Aff. ¶ 10.)

Although the City, the County, the State, and the users were generally satisfied with

the Landfill, the Landfill was poorly located and was not designed to prevent the migration

of contaminates.  (Sullivan Dep. 18.)  Moreover, it did not conform to the state of knowledge

in the scientific and engineering communities at the time it began operations.  It is not

disputed that by the 1960s and 1970s it was generally understood in scientific and

engineering communities that soil or ground water contamination was likely to result from

the disposal of waste into nonengineered landfills; that liners could be used to improve

landfills; and that burial of waste in sandy soil just above or into the water table was likely

to cause ground water contamination.  (Sullivan Rpt. ¶ 3.0, Op. 1; Douthit Dep. 44-45.)

Travelers has presented testimony from its expert, Daniel Sullivan, that the Landfill did not

conform to the "state of knowledge":

> By 1966, when the ASTL began operations, the state-of-knowledge and
> scientific understanding was such that it was known in the industrial, scientific
> and engineering communities that shallow burial of municipal and industrial
> wastes in sandy soil near a river and just above or into the water table (i.e.,
> waste disposal conditions like the ASTL) would likely cause surface water and
> ground water contamination. It was understood that soil or ground water

16

> contamination would likely result from the disposal of waste into
> non-engineered landfills sited in unsuitable locations.

(Sullivan Rpt. ¶ 3.0, Op. 1, ECF No. 59-8.)  However, Sullivan acknowledged that the "state

of knowledge" did not necessarily reflect actual practices.  (Sullivan Dep. 23.)  There is no

evidence that the "state of knowledge" described by Sullivan was known or followed by

those who were designing, licensing, and inspecting landfills in the 1966-1981 time period.

Leonard Zulewski, a district sanitarian who inspected landfills on behalf of the Michigan

Department of Public Health and later the Department of Natural Resources, testified that

engineering plans were not required for landfills until 1987-1989.  (Zulewski Dep. 19, 21,

33, ECF No. 72-6.)  Sullivan did not know of any Michigan municipal landfills built in 1966

that used a liner, and the Landfill was closed before any regulatory body required liners for

municipal or hazardous waste landfills.  (Sullivan Dep. at 24-27.)

C.  Analysis

      The Landfill was poorly located in an area where the soils are permeable and the

ground water is shallow, and it was not engineered in any way to prevent the contamination

of groundwater.  At the time the Landfill was constructed, it did not conform to the best

practices in the scientific and engineering communities.  The relevant case law, however,

does not condition application of the container approach to discharges into landfills that

conformed to the state of the knowledge.  The applicable standard for landfills is "state of

the art," or "then-contemporary standards."  *City of Albion*, 73 F. Supp. at 852; *South

Macomb*, 572 N.W.2d at 703; *Kent County*, 568 N.W.2d at 433.

The landfills at issue in *Kent County* and *South Macomb* are virtually identical to the Landfill at issue in this case.  There is no factual dispute that this Landfill, like the landfills at issue in *Kent County* and *South Macomb*, conformed to then-contemporary standards when it was built.  There is also no dispute that it was licensed by the State throughout the time it was used by Decker.  The Court is satisfied that Decker's placement of its waste in the Landfill is equivalent to the placement of waste in a container, and that, under the facts of this case, the Michigan Supreme Court would apply the container approach used in *Kent County* and  *South Macomb*.  Under this approach, the relevant discharge is the discharge from the Landfill into the environment rather than the placement of waste into the Landfill.

Travelers has not met its burden of showing that the pollution exclusion applies.  Accordingly, Travelers' motion for summary judgment on the pollution exclusion will be denied.  Moreover, because there is no evidence to suggest that Decker was on notice of any problems at the Landfill or that Decker "intended or expected" that its wastes would be discharged from the Landfill into the environment, the Court will enter a declaratory judgment that the pollution exclusion does not bar coverage regarding the Landfill.

## IV.

Decker has moved for summary judgment on its complaint and on Travelers' counterclaim.  Decker's complaint and Travelers' counterclaim both seek declarations on whether Travelers is obligated to defend and indemnify Decker for claims arising out of the Landfill.  Because the complaint and counterclaim are essentially mirror images of each

18

other, Decker's motions for summary judgment contain overlapping arguments that will be addressed together.

As previously noted, the Polies provide coverage for "all sums which the insured shall become legally obligated to pay as damages because of (a) bodily injury; or (b) property damage; to which this insurance applies, caused by an occurrence." (ECF Nos. 9-14.) Decker contends that the Policies provide coverage for defense and indemnity costs incurred with respect to the Landfill because there was an "occurrence" and "property damage" and because the pollution exclusion does not apply. Travelers opposes Decker's motions based on its contention that coverage is precluded by the pollution exclusion and its contention that Decker has not met its burden of showing it has satisfied all conditions under the Travelers Policies.

As noted in Section III above, the Court has concluded that the pollution exclusion does not bar coverage regarding the Landfill. Accordingly, the Court must consider whether Decker has demonstrated that it is entitled to coverage under the Policies. Decker, as the insured, bears the initial burden of establishing that its claims fall within the scope of the policy's insuring agreement. *Tooling Mfg. & Tech. Ass'n v. Harford Fire Ins. Co.*, 693 F.3d 665, 671 (6th Cir. 2012) (citing *Heniser v. Frankenmuth Mut. Ins. Co.*, 534 N.W.2d 502, 510 (Mich. 1995)).

There is no dispute that Travelers provided comprehensive general liability coverage to Decker during the four year period from January 1, 1973 through January 1, 1977. There

19

is no dispute that the Policies agree to pay "all sums which the insured shall be come legally obligated to pay as damages because of . . . property damage caused by an occurrence.  The 1973-1975 Policy defines "property damage" as "injury to or destruction of tangible property. " The 1975-1976 and the 1976-1977 Policies define "property damage" as a "physical injury to or destruction of tangible property which occurs during the policy period."  Travelers has admitted that "property damage" as defined in the Policies occurred at the Landfill during the four-year time period  when the Travelers Policies were in effect.  (Answ. to Req. for Admission #7, ECF No. 65-2.)

The 1973-1975 Policy defines "occurrence" as "an accident . . . which results, during the period this policy is in effect,  in . . . property damage."  The 1975-1976 and the 1976-1977 Policies define an "occurrence" as "an accident, including continuous and repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the Insured."

Because Travelers acknowledges that there was property damage, the only issue with respect to occurrence is whether it was the result of an "accident" that was not expected or intended by Decker.   Under Michigan law, the relevant issue is whether the insured subjectively expected or intended the resulting property damage.  *Fireman's Fund Ins. Cos. v. Ex-Cell-O Corp.*, 750 F. Supp. 1340, 1350 (E.D. Mich. 1990).  Decker's principles have denied that they had any expectation, intent, or knowledge that Decker's wastes would migrate from the landfill, and Travelers has provided no evidence to suggest that Decker did

20

expect or intend that its wastes would leave the Landfill. The Court is satisfied that there was an occurrence because the property damage was the result of an accident that was neither expected or intended.

Even though Travelers has not identified any issues of fact with respect to property damage and an occurrence under the Policies, Travelers contends that Decker is not entitled to a declaratory judgment that it is entitled to coverage because Decker has not met its burden of showing it has satisfied all conditions precedent under the Policies. *See Bruinsma v. State Farm Fire & Cas. Co.*, 410 F. Supp. 2d 628, 633 (W.D. Mich. 2006) (holding that insureds bear the burden of proof to show actual compliance with all conditions precedent under the policy).

Although an insured bears the burden of proof that it has satisfied all conditions precedent, the Federal Rules of Civil Procedure provide that "when denying that a condition precedent has occurred or been performed, a party must do so with particularity." Fed. R. Civ. P. 9(c). Decker alleged generally in its complaint that all conditions precedent to Travelers insuring Decker under the Policies have been performed.[5] (Compl. ¶ 15.) Travelers made only a general denial to this allegation its answer. However, Travelers asserts that its affirmative defense numbers 19-26 address Decker's failure to meet conditions precedent. (Answ. ¶ 15, Affirm. Def. 19-26, ECF No. 8.) These same defenses are repeated

---

[5]Under Rule 9(c) it is sufficient to allege generally that all conditions precedent have occurred.

in Travelers' counterclaim.  (CounterCl. ¶ 29, ECF No. 8.)

Although Travelers has directed the Court's attention to eight separate affirmative defenses that purportedly reference conditions precedent, it appears that Travelers is only relying on one condition precedent that was not met.  Travelers contends that Decker did not notify Travelers of the EPA's requests for information in 1988, 1992, and 1994, until November 1995.  (Def. Br. at 3, n.4, ECF No. 71.)  Travelers asserts that it was prejudiced by this late notice and that the late notice precludes coverage.  (*Id.* at 17.)

None of the affirmative defenses or counterclaim allegations referenced by Travelers identify the EPA requests for information.  Most of the affirmative defenses referenced by Travelers are phrased in terms of "to the extent that" Decker has violated a condition precedent.  These defenses do not conform to the requirements of Rule 9(c) because they do not deny the fulfillment of a condition precedent "with particularity."  Travelers has merely cited defense theories without reference to the Policies or to the relevant facts.  *See Stryker Corp. v. XL Ins. Co., Inc.*, — F. Supp. 3d —, 2014 WL 5493195 (W.D. Mich. Oct. 30, 2014) ("Stating that claims are barred 'to the extent' that they failed to comply with 'any' condition of the TIG Policy is not a denial of the performance of a condition precedent 'with particularity.'").

Travelers contends that Rule 9(c) does not require that a denial of the performance of a condition precedent be made in an answer, and that it is sufficient to raise specific denials in a summary judgment motion.  Travelers cites an unpublished Sixth Circuit opinion in

support of this proposition.  *See Heights Driving Sch., Inc. v. Top Driver, Inc*., 51 F. App'x

932, 939-40 (6th Cir. 2002) (holding, under the circumstances of that case, that it was

sufficient to raise the specific denials of the performance of a condition precedent in a

summary judgment motion).

This Court is not inclined to follow *Heights Driving School.*  It is unpublished and it

is distinguishable.  In  *Heights Driving School* the court noted that the condition precedent

had been identified in a letter and that there did not appear to have been any real confusion

at trial about the contract clause at issue.  *Id.* at 940.  Moreover, *Heights Driving School* is

only authority for raising the specific denial of performance of conditions precedent in a

motion.  *See id.* at 939-40.   Travelers has not raised the condition precedent in a motion for

summary judgment.

Travelers acknowledges that it became aware of the EPA's requests for information

in 1995, and was aware of Decker's response to those requests in 1996.   Travelers

accordingly had the information necessary to identify any defense associated with these

requests with particularity.  Even if Travelers mistakenly failed to identify the defense in its

answer and affirmative defenses, it could have moved to amend its pleadings when it became

aware of the omission.  "Moving for leave to amend the pleadings is the obvious and proper

method for repairing pleadings that failed to raise such preliminary matters."  *E.E.O.C. v.

Serv. Temps Inc*., 679 F.3d 323, 333 (5th Cir. 2012).  Judicial leniency in the application of

Rule 9(c) may called for when other communications fulfill the pleading function "by

narrowing the issues to be adjudicated and notifying the claimant of some of the defenses he or she may be obliged to meet at trial." 5A Charles Alan Wright, et al., *Fed. Prac. & Proc. Civ.* § 1304 (3d ed.) However, in this case, given the vagueness of the affirmative defenses, and the lack of evidence that Decker was on notice of this claim before the close of discovery, the Court is not convinced that the essential pleading functions have been met. Accordingly, the Court will not permit Travelers to raise the issue of untimely notice of the EPA's requests for information at trial.

Travelers has also argued that it had no duty to defend or indemnify Decker with respect to the EPA administrative claim because its policy was not in effect when the contamination was discovered. The Court rejects Travelers' reliance on the manifestation theory as a basis for not defending the EPA administrative claim. As early as 1996, this Court was convinced that the Michigan Supreme Court would hold that coverage in environmental contamination cases would be triggered by the time the wrongful act was done, rather than when the injury first manifested itself. *Tiscornia v. Travelers Corp.*, 1996 WL 33170228, at *4 (W.D. Mich. 1996) (Enslen, C.J.) This Court's prediction was correct because the Michigan Supreme Court did in fact apply the injury-in-fact trigger of coverage when it was presented with analogous facts in 1998. *See Gelman Sciences, Inc. v. Fid. & Cas. Co. of New York*, 572 N.W.2d 617, 622 (Mich. 1998), *overruled on other grounds by Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776 (Mich. 2003).

Because Travelers does not dispute that Decker gave it timely notice of the federal suit or the MDEQ claim, because the Court will not permit Travelers to raise the issue of the allegedly untimely notice of the EPA's requests for information, and because the Court rejects Travelers' reliance on the manifestation theory as a basis for avoiding a duty to defend and indemnify Decker on the EPA administrative claim, the Court finds that Travelers owes Decker a duty to defend and indemnify with respect to all of the Landfill claims. However, to the extent Decker seeks rulings on the extent of its damages, the Court declines to make any rulings due to the presence of issues of fact concerning allocation. *See* Part V below.

## V.

In the event this Court determines that Travelers is obligated to provide Decker with insurance coverage, Travelers contends that any such obligation would be limited to a pro rata, time-on-the-risk share that is determined by comparing the period of time that Travelers issued coverage and the period of time during which property damages in fact occurred. Decker opposes the motion.

Courts and commentators have identified a number of theories for determining what events trigger coverage under standard general liability policies. *Gelman Sciences*, 72 N.W.2d at 622 (listing the exposure, injury-in-fact, manifestation, and continuous trigger theories). "Ultimately, it is the policy language as applied to the specific facts in a given case that determines coverage." *Id.*

The Travelers Policies all provide that Travelers will pay "all sums which the Insured

shall become legally obligated to pay as damages" because of "property damage" caused by "an occurrence." The Policies further require that the property damage or the occurrence take place during the policy period.[6] In *Gelman*, the Michigan Supreme Court determined that with respect to a policy that similarly limited coverage to property damage that occurs "during the policy period," "actual injury must occur during the time the policy is in effect in order to be indemnifiable, i.e., the policies dictate an injury-in-fact approach." *Gelman*, 572 N.W.2d at 623. By their terms, the Travelers Policies apply only to property damage that occurs during the policy period. Plaintiff has not refuted Travelers' suggestion that injury-in-fact is the proper trigger, nor has Plaintiff argued that any language in the Policy calls for an alternative trigger. Accordingly, the Court will apply the injury-in-fact trigger.

The more concrete dispute between the parties is how to apply the injury-in-fact trigger to determine coverage in this case. *Gelman* recognized that "in some cases in which the plaintiff has been able to establish that property damage occurred sometime within one or several policy periods, the plaintiff may not be able to pinpoint when the property damage actually occurred, or to apportion the amount of damage occurring during each period." 572 N.W.2d at 625. In such cases, courts should not employ a strict standard of proof regarding injury in fact, but should instead endeavor to fairly allocate the risk. *Id.* at 625-26.

Because the property damage in this case occurred over the course of many years when Decker was not insured by Travelers, the Court must consider how to allocate

[6]*See* discussion in Section IV, above.

26

Travelers' share of the liability.  Although there are a number of available allocation methods, the choice of the trigger theory is related to the method a court will choose to allocate damages between insurers. *Arco Indus. Corp. v. Am. Motorists Ins. Co.*, 594 N.W.2d 61, 68 (Mich. Ct. App. 1998), *modified on other grounds*,  594 N.W.2d 74, *aff'd*, 617 N.W.2d 330 (Mich. 2000).  In *Arco* the court held that where the policy language called for an injury-in-fact trigger, the "time-on-the-risk" method of apportionment should be used in cases involving continuous property damage and successive policies of liability coverage. *Id.* at 69; *see also Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 4:01-CV-157, 2005 WL 1610663, at *6-7 (W.D. Mich. July 1, 2005) (holding that pro rata allocation was consistent with policy language obligating the insurer to provide coverage for the policy period only, not for damages arising before or after the policy period).  The "time-on-the-risk" method of allocation

> allocates liability among triggered policies using the periods covered by each insurer without considering the coverage limits of the triggered policies. Under this method, insurers are responsible for the portion of the underlying injury that occurred during their policy period; the effect is to prorate coverage for continuous damage across each period that the damage occurred.

*Id.* at 68.

Decker opposes application of the time-on-the-risk method of allocation.  Decker contends that the Policies require Travelers to pay "all sums" for which Decker is liable. Under the "all sums" approach, insurers are jointly and severally liable for all defense costs. *Century Indem. Co. v. Aero-Motive Co.*, 318 F. Supp. 2d 530, 544 (W.D. Mich. 2003).  In

support of the "all sums" approach, Decker notes that the Policies provide that Travelers will pay "all sums" which the Insured shall become legally obligated to pay as damages because of property damage caused by an occurrence, and that there is nothing in that language which mentions a time period.  The Court rejects Decker's argument because it simply ignores the Policies' definitions of the terms "property damage" and "occurrence" which limit coverage to property damage or occurrences "during the policy period."

Decker does not address the pro rata "time-on-the-risk" cases cited by Travelers except to assert that reliance on *Arco* is misplaced because *Arco* "started off wrong" by stating its job was to uphold the intent of the drafters rather than the parties.  (Pl. Br. 15.) Decker has not explained how this impacts the analysis in *Arco*.  Instead, Decker refers the Court to *Dow Corning Corp. v. Continental Casualty Co.*, No. 200143, 1999 WL 33435067 (Mich. Ct. App. Oct. 12, 1999), in  support of applying the "all sums" approach even though the policy contains the occurrence language limiting it to "actual injury during the policy period."

This Court declines to follow *Dow Corning*.  *Dow Corning* is an unpublished per curiam case arising in the very different context of personal injuries from breast implants. More importantly, the policy at issue in *Dow Corning* specifically provided that the Insurer would continue to provide coverage if an injury continued beyond the termination of the policy.  1999 WL 33435067, at *7.  No similar provision is found in the Travelers Policies. *See City of Sterling Heights v. United Nat. Ins. Co.*, No. 03-72773, 2007 WL 172529, at *4

(E.D. Mich. Jan. 19, 2007) (declining to follow *Dow Corning* despite policy's "all sums" language because of the absence of policy language expressly promising that, in the event of a continuing personal injury, the insurance company would continue to protect the Insured for damages arising out of that personal injury even after the policy's termination date).

The Court is satisfied that a pro rata, time-on-the-risk allocation is consistent with the policy language in this case. The Travelers Policies, like the policies at issue in *Arco* and *Stryker*, obligate Travelers only to provide coverage for property damage that occurs during the policy period, not for damages arising before or after the policy period.

The next issue is how to apply the pro rata time-on-the-risk allocation to the facts of this case. The parties agree that Travelers only insured Decker for a four-year period, from January 1, 1973 to January 1, 1977. Travelers has presented evidence from Daniel Sullivan, its expert witness, that the property damage occurred over a 40-year period, from 1965 to 2004. This is the period, according to Sullivan, when groundwater was likely impacted by waste leachate:

> If we conservatively assume that leachate was first generated by wastes disposed of at the ASTL in 1965 and also conservatively assume that buried waste in direct contact with ground water continued to degrade ground water until at least 2004, we arrive at 40 years of gradual and protracted degradation of ground water quality beneath the ASTL . . . .

(Sullivan Rebuttal Rpt. 6, ECF No. 62-11.) Travelers contends that the appropriate formula for allocation is to divide the forty years of property damage by the four years of coverage.

Sullivan's opinion that the property damage continued for forty years is premised in

part on the fact that disposal of waste in the gravel pit occurred prior to 1966.  (*Id.*)

However, there is contradictory evidence in the record concerning disposal at the site prior

to the Landfill's opening in 1966.  (Wilkinson Rpt. 2, ECF. No. 72-9.)  There is also a

question of fact as to whether those wastes would have caused ground water damage in light

of Sullivan's testimony that the amount and types of waste disposed of prior to 1966 are

unknown.  (Sullivan Rpt. 18, 20, ECF. No. 62-8.)  Sullivan acknowledged that the amount

and type of waste would make a difference.  (Sullivan Dep. 99, ECF No. 72-7.)  In addition,

although Sullivan's rebuttal report assumes that the property damage continued through

2004, his prior report merely suggested that the property damage ceased sometime after 1999

when the Landfill.  (Sullivan Rpt. 20, ECF. No. 62-8.)

Decker asserts in its reply brief that a more equitable allocation method would be to

divide the term of the its alleged use of the site (approximately 15.25 years) by the four years

of coverage.  Decker cites two cases in support of its argument for relying on the term of use

as opposed to the term of property damage.  *See Fireman's Fund Ins. Cos. v. Ex-Cell-O*

*Corp.*, 685 F. Supp. 621, 626 (E.D. Mich. 1987)*; Fireman's Fund Ins. Cos.*,790 F. Supp.

1318, 1323 (E.D. Mich. 1992).  Travelers has not had an opportunity to respond to this

argument.

The Court is not in a position, at this time, to determine how to apply the pro rata

time-on-the-risk formula to the facts of this case.  There are factual issues and the need for

further legal argument.  Accordingly, the Court will grant in part and deny in part Travelers'

motion for partial summary judgment on trigger and allocation.  To the extent Travelers seeks a declaration that it is only responsible for property damage that actually occurred during the time the Travelers Policies were in effect, and that allocation will be determined by application of the pro rata, time-on-the risk allocation method, the motion is granted. However, to the extent Travelers seeks a declaration that the property damage is deemed to have occurred from 1965 through 2004, and to the extent Travelers seeks a declaration that it would only be responsible for 1/10th of Decker's post-tender defense and/or indemnity costs, the motion is denied.

An order consistent with this opinion will be entered.


Dated: <u>February 3, 2015</u>                              <u>/s/ Robert Holmes Bell</u>
                                                        ROBERT HOLMES BELL
                                                        UNITED STATES DISTRICT JUDGE