UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DECKER MANUFACTURING
CORPORATION,

    Plaintiff,

v.

THE TRAVELERS INDEMNITY
COMPANY,

    Defendant.
_____/

Case No. 1:13-CV-820

HON. ROBERT HOLMES BELL

## **OPINION**

This matter is before the Court on Defendant Travelers Indemnity Company's renewed motion for partial summary judgment on trigger and allocation of damages. (ECF No. 90.) For the reasons that follow, the motion will be granted.

## I.

In a prior opinion, this Court determined that Travelers' insurance coverage obligation with respect to the Albion Sheridan Township Landfill (the "Landfill" or "ASTL") would be determined based on the pro rata time-on-the-risk formula. (Feb. 3, 2015, Op. 29, ECF No. 79.) The Court further determined that factual and legal issues prevented the Court from determining how to apply the formula under the facts of this case. (*Id.* at 29-31.) At the final pretrial conference the Court granted Travelers' request for further briefing on the issue of trigger and allocation of damages. (ECF No. 87.)

Under the pro rata time-on-the-risk formula, the court divides the period of time that the insured provided insurance by the period of time during which property damage occurred. "[E]ach insurer's share of the settlement is equal to a straightforward fraction: The numerator is the amount of time the insurer provided relevant coverage, and the denominator is the total amount of time covering the loss." *City of Sterling Heights, Mich. v. United Nat. Ins. Co.*, 319 F. App'x 357, 361 (6th Cir. 2009).

In this case, there is no dispute that Travelers provided insurance for a four-year period, from January 1, 1973 to January 1, 1977, so the numerator is four. The issue the Court was unable to resolve on the previous briefs was how long the property damage continued, or, in other words, what is the appropriate denominator.

Because the period during which property damage occurred is often difficult to determine with precision, most courts that have held that, in the absence of definitive proof otherwise, the period should run from the date an insured first used the site for waste disposal until such time as the site has been remediated. *See*, *e.g.*, *Wolverine World Wide, Inc. v. Liberty Mut. Ins. Co.*, No. 260330, 2007 WL 705981, at *3 (Mich. Ct. App. Mar. 8, 2007); *Penn. Nat. Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d 106, 113 (4th Cir. 2012) (holding that "each insurer is liable for that period of time it was on the risk compared to the entire period during which damages occurred"); *Olin Corp. v. Certain Underwriters at Lloyd's London*, 468 F.3d 120, 129 (2d Cir. 2006) ("[A]llocation must be over all years in which property damage occurred."); *Peabody Essex Museum, Inc. v. U.S. Fire Ins. Co.*, No. 06cv11209,

2010 WL 3895172 at *12 (D. Mass. Sept. 30, 2010) (marking the end of the allocation period by the date when the spilled oil stopped causing additional property damage).

In its original motion for partial summary judgment on trigger and allocation Travelers' presented evidence that the property damage occurred over a 40-year period, from 1965 to 2004, when groundwater was likely impacted by waste leachate. Travelers contended that the appropriate formula for allocation was to divide the forty years of property damage by the four years of coverage. Because there was conflicting evidence on the period of property damage, the Court determined that there were questions of fact that precluded entry of summary judgment for Travelers' on the trigger and allocation issue. (Feb. 3, 2015, Op. 29, ECF No. 79.)

For purposes of its renewed motion for partial summary judgment on trigger and allocation, Travelers has agreed to accept an allocation period of June 1967 to September 1999, a total of 387 months, or 32.25 years. Travelers contends there is no issue of fact that property damage occurred at a minimum from June 1967, a year after Decker began using the Landfill, to September 1999, when the Landfill was capped. Travelers contends that the pro rata time-on-the-risk formula should be applied as follows: divide the 48 months of Travelers' coverage (the numerator) by 387 months of actual property damage (the denominator), resulting in a pro rata allocation percentage to Travelers of 12.40%.

In the opinion of Travelers' expert, Daniel Sullivan, "[g]round water was likely impacted by waste leachate no later than one year after waste disposal began," and

3

"[c]ontaminant movement from the waste to ground water would have continued at least until the landfill cap was installed in 1999." (Sullivan Rpt. 19-20, ECF No. 62-8.) Decker's expert, Timothy Douthit, agreed with Sullivan's opinion regarding the time frame when ground water was impacted. (Douthit Rebuttal Rpt. ¶ 5, ECF No. 62-16; Douthit Dep. 52, ECF No. 62-12.) Douthit agreed that until the landfill cap was installed in 1999, contaminants continued to move into the groundwater. (Douthit Rebuttal Rpt. ¶ 5; Douthit Dep. 51-52.) Douthit's only qualification with respect to Sullivan's opinion on the groundwater was that the continued leaching of contaminants "did not lead to any increased remediation requirements between the time the ASTL ceased operations [1981] and the time that the landfill cap was installed [1999]." (Douthit Rebuttal Rpt. ¶ 5.)

Douthit's opinion that the continued leaching of contaminants into the groundwater did not affect the scope of the remedy is not a suggestion that the property damage ceased after the Landfill was closed. Douthit clearly acknowledged in his expert report that there was still leaching after the Landfill closed, and that "capping of the landfill, or rather, the prevention of precipitation infiltration and percolation through the landfill, has been successful in causing a continuous and ongoing decrease in dissolved arsenic concentrations." (Douthit Rpt. ¶ 19, ECF No. 62-14.)

Decker does not quarrel with Travelers' revised estimate of the 387-month time frame during which the ground water was impacted by contaminants from the Landfill. Instead, Decker has raised some legal arguments against application of that formula. None of

Decker's legal arguments are persuasive.

In its response brief, Decker requests the Court to "review and reconsider whether any allocation is appropriate." (Def. Resp. Br.1, ECF No. 92.) Decker has also presented several alternative allocation methods for the Court's consideration. (*Id.* at 3-11.)

This Court has already determined that it will allocate damages under the pro rata time-on-the-risk formula, and explained its reasons for doing so. (Feb. 3, 2015, Op. 25-31, ECF No. 79.) Decker is requesting the Court to reconsider this decision. As a general rule, "motions for reconsideration which merely present the same issues ruled upon by the Court shall not be granted." W.D. Mich. LCivR 7.4(a). Moreover, a party who moves for reconsideration must demonstrate "a palpable defect by which the Court and the parties have been misled," and that "a different disposition of the case must result from a correction thereof." *Id*. Decker is re-arguing the same issue already ruled on and has not demonstrated that the Court's previous determination was erroneous. The time-on-the-risk method of apportionment should be used in cases, such as this one, "involving continuous property damage and successive policies of liability coverage." *Cont'l Cas. Co. v. Indian Head Indus., Inc.*, No. 05-73918, 2010 WL 188083, at *5 (E.D. Mich. Jan. 15, 2010) (quoting *Arco Indus. Corp. v. Am. Motorists Ins. Co.*, 594 N.W.2d 61, 69 (Mich. Ct. App. 1998)). The Court stands by its previous decision to apply the pro rata time-on-the-risk formula.

Decker contends that if the Court does use the time-on-the-risk formula, the total period over which liability is to be allocated (the denominator) is not the period of

5

groundwater seepage, but the period the Landfill was used by Decker. Decker contends it used the Landfill for 15.25 years at most, from June 13, 1966, to September 1, 1981, when the Landfill closed. Four years of coverage divided by 15.25 years would put Travelers' responsibility at 26.23%. Alternatively, assuming groundwater damage began approximately one year after the Landfill opened, Decker contends that Travelers is responsible for four years of coverage divided by 14.25 years, or 28.1%. According to Decker, using the period of use as the denominator was approved in both *Arco Industries Corp. v. American Motorists Insurance Co.*, 594 N.W.2d 61, 70 (Mich. Ct. App. 1998), and *Fireman's Fund Insurance Companies v. Ex-Cell-O Corp.*, 685 F.Supp. 621, 626 (E.D. Mich. 1987).

In *Fireman's Fund*, the Court ordered the insurer "to bear the costs of defense in the proportion that the period it was on the risk bears to the total period of the policyholder's(s') alleged use of the site." 685 F. Supp. at 626. In *Arco*, the court held that the "the coverages of the various insurers were triggered over a twenty-year period from 1967 to 1987, "between the time Arco began operating the facility and the cessation of wastewater discharges into its seepage lagoon in 1987," which coincided with the time period that Arco discharged solvents at its manufacturing plant. 594 N.W.2d at 68, 70, 73.

It is not clear to this Court what factors led the courts to choose the insured's period of use as the denominator in *Fireman's Fund* and *Arco*.[1] Nevertheless, the Court does not

---

[1] Travelers suggests that the 20-year allocation period adopted in *Arco* appears to have been based either upon agreement of the parties or the fact that Arco only sued those insurers on the risk during that time period. (Def. Reply Br. 6 n.4.)

view these cases as authority for applying a denominator that is shorter than the period of contamination. There is no suggestion in either *Fireman's Fund* or *Arco* that the either court was rejecting the well-established principle that the denominator should reflect the period during which property damage occurred.  In fact, both opinions contain language that supports using the period of property damage as the allocation period.  In *Fireman's Fund*, the court specifically held that "each exposure of the environment to a pollutant constitutes an occurrence and triggers coverage," and that "[a]n insurer on the risk during the period of alleged exposure is liable for the policyholders' defense in the proportion that the period it was on the risk bears to the total period of alleged exposure."  685 F. Supp. at 626. Similarly, in *Arco*, the court stated that "[o]nce a court determines the scope of the progressive injury, that is, the total damage . . . it can readily allocate the damages among the triggered policies."  594 N.W.2d at 70.

Even if the Court uses the period of contamination for the denominator, Decker contends that the period of contamination ended in 1981 because (1) there is no evidence attributing the groundwater contamination to Decker's waste; (2) there was no "increase or spread of the total extent of contamination" after that point; and (3) groundwater treatment was neither ordered nor implemented by the EPA.  Decker's arguments are not convincing.

Decker contends that because there was no finding that Decker was liable in the underlying claim, there is no reasonable basis to allocate any of the costs incurred to Decker. (Pl. Resp. Br. 24.)  Decker's insistence that it did not cause the groundwater contamination

7

is not relevant to Travelers' motion on trigger and allocation.  Although Decker denied liability for contamination at the site, Decker has entered into a settlement agreement, under which Decker assumed some liabilities for remediating the site.  Through this lawsuit Decker is attempting to obtain reimbursement from Travelers for Decker's defense and remediation costs associated with the Landfill.  The issue of Decker's responsibility for those costs is simply irrelevant to this litigation.

Decker's second contention, that there was no "increase or spread of the total extent of contamination" after the Landfill closed, is not supported by the evidence.  The evidence is uncontradicted that contaminants continued to leach from the Landfill into the groundwater until the landfill cap was installed in 1999.  (Douthit Rebuttal Rpt. ¶ 5; Douthit Dep. 51-52.)  The EPA's 1995 Adminsitrative Order for Remedial Design and Remedial Action states:

> The major present routes of exposure to hazardous substances at the Albion-Sheridan Township Landfill are . . . skin contact and inhalation of contaminants in groundwater. . . . Rainwater percolating through the uncapped wastes is presently leaching contaminants into the groundwater and carrying those contaminants with it as it flows toward nearby residential wells and the Kalamazoo River.

(EPA Admin. Order 9-10, ¶ 16, ECF No. 62-3.)  Moreover, Decker stipulated in the Joint Final Pretrial Order that "[p]roperty damage, as defined by the Travelers Policies issued to Decker, occurred at the ASTL from sometime after June 13, 1966 to 1999."  (Jt. Final Pretrial Order 10, ¶ 17, ECF No. 85.)

Decker's third argument, that groundwater treatment was neither ordered nor implemented by the EPA, does not provide a reason for using 1981 as an end date for the

8

allocation period. Property damage includes ongoing passive contamination through the continuing leaching and migration of pollutants in the groundwater after active contamination has ceased. *See Olin Corp.*, 468 F.3d at 131 ("[P]roperty damage occurs as long as contamination continues to increase or spread, whether or not the contamination is based on active pollution or the passive migration of contamination into the soil and groundwater."); *Wolverine World Wide, Inc.*, 2007 WL 705981, at *3 (noting that insurers on the risk when incremental environmental degradation continues may be liable on a pro-rata basis); *Domtar, Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 732 (Minn. 1997) ("Each insurer is liable for that period of time it was on the risk compared to the *entire* period during which damages occurred." (emphasis in original)). There is no dispute that property damage continued after 1981 because contaminants continued to leach from the Landfill into the groundwater. There is also no dispute that the cap was designed to prevent further groundwater contamination.[2] Decker's responsibilities under the Consent Decree include

---

[2]Plaintiff's expert stated in his report:

> The cap included an impervious, flexible membrane, designed specifically to eliminate the percolation of precipitation through the landfill material, thereby minimizing or eliminating the propagation of reducing conditions to the aquifer below, and downgradient of, the landfill. The cap would also prevent the leaching of arsenic from landfilled materials by percolating precipitation. Accordingly, the years between 1981 and 1999 fall within the allocation period.

(Douthit Expert Rpt. ¶ 16, ECF No. 62-14.)

9

groundwater monitoring. (Consent Decree 21-25, ECF No. 71-5.) In 2012 the EPA noted that one of the five major components of the Landfill remedy involves "[m]onitoring of groundwater to ensure effectiveness of the remedial action in lowering the arsenic concentration in groundwater through natural oxidation." (EPA Third Five Year Review Rpt. 5, § 4.1, ECF No. 62-4.)

Because there is no genuine dispute with regard to the time period over which property damage occurred, or the fact that the property damage included contamination of the groundwater, the Court concludes that the period of allocation does not end in 1981, when Decker ceased using the Landfill. Rather, the appropriate denominator for purposes of the time-on-the-risk formula extends from June 1967 to September 1999, for a total of 387 months.

Decker asserts that the even if the damages continued from 1967 to 1999, the allocation period should be reduced so as not to include years in which Decker did not have pollution liability.

The general rule is that "policyholders must bear their own pro rata share of costs for any period during which they had no coverage or cannot identify the insurer." *Fireman's Fund*, 685 F. Supp. at 626 (citing *Ins. Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 451 F. Supp. 1230, 1244 (E.D. Mich. 1978)); *Olin Corp.*, 221 F.3d at 326 ("[P]roration [to the insured] is appropriate as to years in which [the insured] elected not to purchase insurance or purchased insufficient insurance."); *Keyspan Gas E. Corp. v. Munich Reinsurance Am.,*

10

*Inc.*, 998 N.Y.S.2d 781, 785 (N.Y. Sup. Ct. 2014) ("For years where an insured has no insurance coverage, the insured generally bears its own pro rata share of the loss.")

Courts recognize an exception where insurance is not available in the marketplace. *See Kesypan*, 998 N.Y.S. 2d at 785 ("Proration to the insured is inappropriate, however, for those years where insurance was unavailable in the marketplace."); *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1204 (2d Cir. 1995) (declining to apply the proration-to-the-insured approach to years after which asbestos liability insurance ceased to be available). The insured bears the burden of proving that insurance was not reasonably available to it. *Keyspan*, 998 N.Y.S.2d at 787.

Decker asserts that environmental coverage was not available after 1977. However, Decker has provided no evidence to support this assertion. Decker merely asserts that after January 1, 1977, all commercial general liability ("CGL") insurance policies contained pollution exclusion clauses.

As the court noted in *Keyspan*, cited by Decker, "[t]he relevant inquiry is not 'limited to whether an insured was able to continue obtaining coverage for the particular risk in the same policy type' but may take into account whether the insured could purchase coverage of another policy type that would have provided similar coverage." *Keyspan*, 998 N.Y.S.2d at 787 (quoting *Olin Corp.*, 221 F.3d at 326). "If coverage under one type of policy becomes unavailable by exclusion, and the insurance customer can but does not buy the excluded coverage separately or in another policy type, it follows that the customer has opted to

self-insure." *Olin Corp.*, 221 F.3d at 326.  In *Olin Corp.*, the Court specifically noted the availability of "environmental impairment liability" insurance policies after CGL Policies were not available without pollution exclusion clauses.  *Id.* at 325.

Decker has not met its burden of producing sufficient evidence to create a material issue of fact as to whether environmental insurance was reasonably available to it in the years after 1977.  Accordingly, the Court finds that Decker must bear its own pro rata share of costs for any period during which it had no coverage.  The Court concludes that Decker's liability with respect to the Landfill is properly limited to 12.40%.

Finally, Decker contends that its defense costs should not be allocated in the same way as indemnification costs.  Decker notes that the duty to defend is broader than the duty to indemnify.  *See*, *e.g.*, *Cincinnati Ins. Co. v. Zen Design Grp., Ltd.*, 329 F.3d 546, 552 (6th Cir. 2003) ("Under Michigan law, courts construe an insurer's duty to defend more broadly than its duty to indemnify.").  However, Decker does not explain how this difference affects the allocation of defense costs in this case.

In *Fireman's Fund*, the court held that "[a]n insurer on the risk during the period of alleged exposure is liable for the policyholders' defense in the proportion that the period it was on the risk bears to the total period of alleged exposure." 685 F. Supp. at 626 (citing *Forty-Eight Insulations*, 451 F. Supp. at 1244 (holding that costs of defense, like the duty to indemnify, "must also be apportioned over the entire period during which the alleged injuries occurred")).  Apportionment of defense costs is also consistent with this Court's previous

rulings:

> [D]efense costs should be apportioned among the insurers because the rationale of *Forty-Eight Insulations* applies and the result is consistent with the *Arco Industries*, which rejected any method of allocation that would require the insurer to pay for any damage occurring outside the policy period.

*Century Indem. Co. v. Aero-Motive Co.*, 318 F. Supp. 2d 530, 545 (W.D. Mich. 2003) (Quist, J.); *see also Alticor, Inc. v. Nat'l Union Fire Ins. Co. of Pa.*, 916 F. Supp. 2d 813, 833 (W.D. Mich. 2013) (Maloney, C.J.) (holding that defense costs were to be allocated using a time-on-the-risk approach).

Because Decker has not identified any factual issues that would preclude application of the time-on-the-risk formula in the manner suggested by Travelers, and because the Court finds no merit to Decker's legal arguments, the Court concludes that Travelers is entitled to partial summary judgment on the issue of trigger and allocation.  The Court will enter a declaration that Travelers' obligation to reimburse Decker for any defense or indemnity costs incurred or to be incurred by Decker with respect to the Albion Sheridan Township Landfill is limited to 12.40% of such costs.

An order consistent with this opinion will be entered.


Dated: May 5, 2015                          /s/ Robert Holmes Bell
                                            ROBERT HOLMES BELL
                                            UNITED STATES DISTRICT JUDGE